**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NO. 1:20-cr-106 (RC)** |
| | **:** | |
| **LIRIM SYLEJMANI,** | **:** | |
| Also known as | **:** | |
| Abu Sulayman al-Kosovi, | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE**
**OF THE UNITED STATES TO ADMIT ISIS DOCUMENTS**
**RELATED TO DEFENDANT AND HIS CO-CONSPIRATORS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully seeks to admit several documents obtained from electronic media recovered in Iraq that relate to the defendant personally, foreign fighters collectively, and the bureaucratic accounting of the military apparatus of the Islamic State in Iraq and al-Sham (hereinafter referred to as "ISIS") generally. The United States requests that the Court hold an evidentiary hearing, pursuant to Federal Rule of Evidence 104(a), to determine the admissibility of the ISIS documents before trial. The government submits that the nature of these documents and the circumstances of their discovery in Iraq establish their authenticity. The government further submits that these documents qualify as exceptions to the hearsay rules that demonstrate their reliability and support their admission into evidence. The government intends to present several witnesses at a pretrial evidentiary hearing to support a determination that these documents should be admitted as evidence against the defendant.

## I.    Factual Background

The defendant. Lirim Sylejmani, was born in Gjilan, Kosovo, on February 7, 1976.  In approximately 2000, he moved to Chicago, Illinois, and thereafter, sought citizenship based on his refugee status arising from, according to his immigration file, "ethnic cleaning by Serbs."   The defendant subsequently became a naturalized United States citizen.  In approximately 2002, he began living with Polish citizen Karolina Katarzyna Suchojad and had several children with her. In the spring of 2011, he left the United States with his family and returned to Kosovo.  He and his family moved to Canada several months later until 2015.  During his time in Canada, the defendant began to embrace Islam.  By the fall of 2014, the defendant began considering moving his family to join ISIS.  Suchojad converted from Catholicism to Islam and reportedly agreed with the defendant's plan to join ISIS[1].  In May 2015, the family moved back to Kosovo.   In order to join ISIS, the defendant worked with an active ISIS member to receive Tazkiyah, or official vouching. Thereafter, the defendant surrendered to that ISIS member the United States passports issued for him and his family and received false Syrian identification documents to use for travel to join ISIS.  The defendant was then connected with a smuggler who helped him and his family enter Syria and join ISIS.  In early November 2015, the family flew to Istanbul, Turkey, and ultimately crossed the Turkish-Syrian border to join ISIS.

Beginning in January 2016, the defendant was communicating with his Kosovo based sister, using Viber and then Surespot.  In mid-January 2016, the defendant told his sister that he and his family were "in the Islamic State."  When his sister asked whether he was working there,

---

[1] ISIS is a foreign terrorist organization that has been designated as such by the United States Secretary of State in some form for almost 20 years.  In 2004, the Secretary of State designated Al Qaeda in Iraq ("AQI") as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under Section 1(b) of Executive Order 13224.  In 2014, this designation was amended to add the alias of Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added ISIS and a number of other aliases to the foreign terrorist organization designation.

the defendant responded, "No not for the moment …. I had some training to finish and now I am looking."  His sister asked, "Are you in the war zone … Or in another state."  The defendant replied, "Now close to Mosul."  When his sister asked if the defendant was satisfied there, the defendant responded, "I have never been happier."  Although his sister asked for the defendant to return to Kosovo with his family "before something bad happens," the defendant replied, "Don't worry because you will change nothing.  Pray to Allah and hope to meet one day when the world will be free from the infidels."

Shortly after entering Syria, the defendant completed his ISIS intake process at an ISIS guesthouse.  He took on the name, Abu Sulayman al-Kosovi and began initial entry training with other ISIS recruits on approximately November 22, 2015.  The defendant, his family and other ISIS recruits moved to Mosul, Iraq, in late November 2015 to complete ISIS military and Sharia[2] law training.  By mid-December 2015, the defendant began his ISIS military and Sharia training.  Before graduating from ISIS military training in mid-December 2015, the defendant pledged "bayat," or allegiance, to the leader of ISIS and to ISIS as an organization.  Upon completion of his military training, the defendant was assigned to the ISIS battalion in Mosul, Iraq, and was issued his own AK-47, four AK-47 magazines, a belt to hold the magazines and two grenades.  In the spring of 2016, the defendant was paid by the ISIS administrative officer in Iraqi Dinar for his first three months of service.  In May of 2016, the defendant reported for guard duty, called "ribat," on the front line of a military operation undertaken by the Syrian Defense Forces (hereinafter referred to as "SDF.") against ISIS at the city of Manbij, Syria.  He continued to serve as a fighter for ISIS until he was injured in a battle with Coalition Forces in June of 2016.  After recovering from his wounds, the defendant was eventually reassigned to a new battalion in the fall

---

[2] "Sharia" is a body of religious law of Islam.  It constitutes a system of duties that are incumbent upon all Muslims by virtue of their religious belief.

of 2017, and was paid for his services during that time.  Between November of 2017 and February

of 2019, the defendant and his family moved southeast to Baghouz, Syria, as the territorial

Caliphate of ISIS collapsed.  On February 27, 2019, the defendant and his family were captured by

Coalition Forces in Baghouz.  The defendant was then incarcerated by the SDF in Syria until he

was transferred to United States law enforcement personnel to face criminal charges in this

District.

As ISIS strongholds were defeated and abandoned, electronic media was recovered by

Coalition Forces and Iraqi personnel in various locations in Iraq and Syria.  In 2017, Mosul, the

capital of Nineveh Province, was liberated from ISIS control.  Electronic media was found in the

rubble of the Media Headquarters for ISIS located in Mosul.  In December 2017, during a raid in

the vicinity of Hasakah Province in Syria, a computer containing a hard drive was discovered.  In

both instances, the electronic media contained roster and payment documents relating to ISIS

fighters.  The defendant's name, personal information and information about his family members

appear on several of these documents.

## II.    Procedural Background

On July 7, 2020, a three count indictment was returned in this District, charging the

defendant   with conspiracy to provide material support or resources to a designated foreign

terrorist organization, in violation of 18 U.S.C. § 2339B; providing and attempting to provide

material support or resources to a designated foreign terrorist organization, in violation of 18

U.S.C. § 2339B; and receiving military-type training from a designated foreign terrorist

organization, in violation of 18 U.S.C. § 2339D.  The defendant was arrested on September 16,

2020, and made his initial appearance on that date.  On November 10, 2020, he was ordered

detained pretrial.

On August 30, 2023, the Court entered a revised scheduling order for the filing of pretrial motions. The deadline for the defense to file pretrial affirmative motions was set for October 30, 2023. The government's deadline for filing pretrial affirmative motions was set for November 21, 2023. Responsive motions by the government are due on November 30, 2023, and responsive motions by the defense are due on December 21, 2023.

### III.    The ISIS Documents Proffered for Admission

The ISIS documents the government seeks to admit at trial consist of Excel spreadsheets of payroll and roster data of ISIS members. The records generally include the following information: (1) ISIS member's name; (2) census number;[3] (3) kunya (or nom de guerre); (4) number of wives; (5) number of children; (6) monthly stipend payments received by the ISIS member; and (7) assigned battalion. The government intends to seek admission of the following ISIS records, which bear the defendant's name and other information:[4]

*UNITAD RECORDS*[5]

- UNITAD_2_USAODC-0000001_1438 شعبان شهر الى عام كفالات ()
- UNITAD_2_USAODC-0000004_العامة البودرة
- UNITAD_2_USAODC-0000006_القريشي معتز ابو فرقة او الخلافة جيش
- UNITAD_2_USAODC-0000008_المبلغ+الاعداد تقسيم
- UNITAD_2_USAODC-0000009_رجب لشهر الجند ديوان
- UNITAD_2_USAODC-0000010_العامة البودرة

---

[3] The ISIS census or identification number was a unique number assigned to each ISIS member in order to keep track of, and update, information related to each individual member, including his assigned battalion, payments received, number of family members, etc. It was also possible for an ISIS member to be assigned more than one census number.

[4] The government also intends to seek admission of a video of ISIS members, including the defendant, attending a wedding that was recorded in Manbij, Syria in the spring of 2016. According to the defendant, who identified the video during his post-arrest, post-*Miranda* waiver interview, the video consists of a sermon by Abu Muqatil Al-Kosovi, the Amir of the Albanian and Abu Bakr al-Sidiq Battalion. During the video, Abu Muqatil Al-Kosovi makes multiple references to mujahedeens- to wit, those who wage jihad. The defendant identified himself in the video as one of multiple individuals who can be seen listening to the sermon.

[5] Each document is identified from its filename, which is the same identification method used in the discovery production. Attached as Exhibit A to this pleading are examples of some of the ISIS records the government seeks to admit, which also bear the defendant's name and other information.

- UNITAD_2_USAODC-0000011_1438 كفالات عام الى شهر شعبان ()
- UNITAD_2_USAODC-0000012_كفالات الاخوة المهاجرين

*NMEC RECORDS[6]*

- NMEC Document 1
- NMEC Document 2

### IV.    Standard for Admissibility of the Documents

A.  <u>Authentication</u>

Federal Rule of Evidence 901(a) governs the authentication or identification of evidence. According to Rule 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  The authenticity inquiry "turns on whether the document is what it purports to be, not its veracity."  *United States v. Hamama*, No. 08-20314, 2010 WL 2649877 at *5 (E.D. Mich. June 30, 2010) (quoting *United States v. Mandycz*, 447 F.3d 951, 966 (6th Cir. 2006) in considering the authenticity of Iraqi Intelligence Service documents that pertained to the defendant.)  As this Court observed in *United States v. Hassanshahi*, 195 F. Supp.3d 35 (D.D.C. 2016), a case involving the admissibility of a document written to the Iranian Minister of Energy, admissibility of such evidence requires the Court to conclude that the proponent "has offered a foundation from which the jury could reasonably find that the evidence is what the proponent says it is."  *Id.* at 48 (quoting *United States v. Safavian*, 435 F. Supp.2d 36, 38 (D.D.C. 2006)).  This Court has recognized that "[t]he threshold for the Court's determination of authenticity is not high," and "the proponent's burden of proof for authentication is slight."  195 F. Supp. at 48 (quoting *McQueeney v. Wilmington Tr. Co.,* 779 F.2d 916, 928 (3d Cir. 1985).  Acknowledging that Rule 901(a) "does not erect a particularly high hurdle" to the admission of

---

[6] These records are also rosters that contain information similar to that which is included in the UNITAD documents.

evidence, nor does it require the proponent "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be," this Court has confirmed that "[t]he ultimate resolution of the evidence's authenticity is reserved for the jury." 195 F. Supp.3d at 48 (citations omitted). It is clear that the court "must admit the evidence if sufficient proof has been introduced to support a finding that the fact does exist, and in spite of any issues the opponent has raised about flaws in the authentication (which only go to the weight of the evidence instead of its admissibility.)" *Id.*; 5 Jack B. Weinstein, *et al.,* *Weinstein's Federal Evidence* § 901.02[3] at 901-13, 901-15. Rule 901(a) requires only "some competent evidence in the record to support authentication." *United States v. Koziy*, 728 F.2d 1314, 1321 (11th Cir. 1984).

Rule 901(b) describes some examples of evidence that satisfies the authentication requirement, at least two of which are relevant here. *See* FRE 901(b)(1) (testimony of a witness with knowledge); FRE 901(b)(4) (distinctive characteristics and the like). In explaining the scope and context of FRE 901(b)(4), the Supreme Court has noted that "[t]he sum of an evidentiary presentation may well be greater than its constituent parts. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence." *Bourjaily v. United States*, 483 U.S. 171, 180 (1987). This Circuit has further stressed that "[t]he applicable test . . . is not whether the evidence of genuineness induces belief beyond a reasonable doubt that the document is the handiwork of the alleged drafter, but whether if it is uncontradicted, a reasonable mind might – though not necessarily would – fairly conclude to the fact of authorship." *United States v. Sutton*, 426 F.2d 1202, 1207 (D.C. Cir. 1969); *United States v. Tann*, 425 F. Supp.2d 26, 35-36 (D.D.C. 2006), *aff'd,* 532 F.3d 868 (D.D.Cir.), *cert. denied*, 555 U.S. 1088 (2008). A document can be

authenticated through presentation of circumstantial evidence, "including the document's own distinctive characteristics and the circumstances surrounding its discovery." *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990), *cert. denied,* 502 U.S. 849 (1991) (drug ledgers held authenticated and admissible); *see also* 1-8 Weinstein's Evidence Manual § 8.01.

Acknowledging that authentication can be established by the contents of a document when taken in conjunction with the circumstances of its discovery, numerous courts have accepted as authentic evidence similar in kind to the ISIS documents proffered in this case. *See, e.g., United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) (Zvornik Brigade military records in Bosnia seized from Zvornik Brigade headquarters); *United States v. Dumeisi*, 424 F.3d 566, 575 (7th Cir. 2006), *cert. denied*, 547 U.S. 1023 (2005) (Iraqi Intelligence Service documents contained in "the Baghdad File" obtained after the invasion of Iraq); *United States v. Skiljevic*, No. 11-CR-72, 2013 WL 3353960 (E.D. Wis. July 3, 2013) at *3-4 (records of military service in the Army of the Republika Srpska provided by the International Criminal Tribunal for the Former Yugoslavia); *United States v. Latchin*, No. 04-CR-661, 2007 WL 9724208 (N.D. Ill. Jan. 22, 2007) at *4, *aff'd,* 554 F.3d 709 (7th Cir. 2009), *cert. denied,* 558 U.S. 1116 (2010) (Iraqi Intelligence Service recruit files located by Iraqi Army officers in a Baghdad residence). In fact, in a recent prosecution, very similar to the instant case, a defendant was charged with providing and conspiracy to provide material support to ISIS. Many of the same ISIS documents as are presented to this Court were found to be authentic and ultimately were admitted against the defendant as evidence of statements of co-conspirators pursuant to FRE 801(d)(2)(E). *See United States v. Musaibli*, 42 F.4th 603 (6th Cir. 2022).

B.  Evidence Supporting Authentication

The government plans to call several witnesses to support the conclusion that the ISIS documents in this case are authentic:

Hassan Hassan:  The government plans to call Mr. Hassan as an expert witness concerning ISIS, including its origin, ideology, leadership, the declaration of the Caliphate, the role of foreign fighters in the Islamic State, the screening and training of new members, including attendance at mandatory military training, ISIS's functionality as a government, ISIS's size and stated ambitions, and what happened as ISIS lost its physical territory.  The government intends to file its more detailed expert disclosure for Mr. Hassan, pursuant to Rule 16(a)(1)(G), in advance of any pretrial hearing concerning the admissibility of the ISIS documents.

Mr. Hassan is an analyst, journalist and author specializing in militant Islam, nonviolent extremism and geopolitics, with a focus on ISIS.  He is currently the Editor-in-Chief of Newlines Magazine.  He is the co-author (with Michael Weiss) of the New York Times best-selling book *ISIS: Inside the Army of Terror*, which has been translated into more than a dozen foreign languages.  His writings appear regularly in *The Atlantic, Foreign Affairs, The New York Times, The Daily Beast, Financial Times, Foreign Policy,* and *The Guardian*, among other publications. He has testified before Congress on extremism, specifically on the ideology of ISIS, and on defeating terrorism in Syria.  He has testified before The United States Commission on International Religious Freedom on safeguarding religious freedom in Northeast Syria.  He has conducted training courses for military personnel, intelligence agencies and diplomats specializing or operating in the Middle East.

Mr. Hassan is expected to provide a history of the sectarian conflict between Sunnis and Shia in Iraq and Syria and the emergence of ISIS after the 2003 invasion of Iraq.  He will

identify and describe a map of ISIS territory, consisting of parts of Iraq, Syria and the surrounding areas, and the rise of ISIS to territorial dominance in Iraq in 2014.  He will define terms such as "caliphate," "jihad," "bayat," "hijra," "ribat," "kunya," "diwans," "Da'esh" and "sharia law."  He will identify the leaders of ISIS, such as Abu Musab al Zarqawi and Abu Bakr al-Baghdadi, and their role in directing the activities of ISIS, as well as the influence of Anwar al-Awlaki as a powerful propagandist.  He will identify the ISIS flag and explain its symbolism.

Mr. Hassan will discuss the recruitment efforts of ISIS directed at foreign fighters to travel to Syria and Iraq to join ISIS, and the purpose for recruiting them.  He will also describe the recruitment process once foreign fighters arrived in ISIS-controlled territory.  Mr. Hassan will discuss the religious training, the military training and other indoctrination given to foreign fighters.  He will explain the large bureaucracy that ISIS developed to keep account of the personnel who joined ISIS, establishing detailed records related to the assignment of personnel to various military and non-military functions, the payment of ISIS members for their work, information about the family members who lived in ISIS territory and the financial support given to them, and the discovery of many ISIS documents after the end of the physical caliphate in 2019.  Mr. Hassan is expected to testify that he has reviewed hundreds of primary source documents related to ISIS, including ISIS intake forms for fighters, ISIS propaganda videos and social media posts, and as a result, he can offer an opinion about the nature of the documents to be offered for admission in this case.

<u>Paolo Irani</u>:   Mr. Irani is employed by an organization known as the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh (UNITAD).  He is a Team leader for an investigative team at UNITAD.  Mr. Irani is expected to testify about the creation of UNITAD by the United Nations to assist Iraqi authorities in investigating and

10

prosecuting crimes committed by ISIS in that country.  Mr. Irani will explain the work of UNITAD in reviewing and analyzing evidence obtained in Iraq for the purpose of identifying potential subjects for Iraqi investigation.  He will discuss his experience in reviewing documents and other evidence recovered in Iraq, as well as his experience in interviewing victims of ISIS violence, witnesses to ISIS violence and former members of ISIS, all of which made him very familiar with the extensive ISIS bureaucracy and documents created by ISIS.  Mr. Irani will discuss how the Iraqi authorities rely upon raw data from electronic media found in ISIS territory to develop additional evidence and pursue criminal investigation against identified subjects.  He will testify about the discovery of 10 hard drives in Mosul, the capitol of the Nineveh Province, where the ISIS Caliphate last operated, at the site of the media headquarters for ISIS after Mosul was liberated. Mr. Irani will explain how a member of his investigative team obtained from Iraqi authorities a copy of those hard drives on or about July 25, 2019.  He will testify about reviewing the nine documents located on the hard drives that include information about the defendant and members of his family, and will state that, based upon his extensive experience reviewing such documents, and the circumstances of the discovery of the hard drives, he believes that they were created by ISIS as membership rosters and evidence of payments made to ISIS members.

Cooperating Witness:  Cooperating Witness is a criminal defendant in a case in another district.  The Cooperating Witness is expected to testify about his involvement with ISIS, his understanding of the ISIS bureaucracy, ISIS record-keeping and his duties with ISIS.  Based upon his familiarity with the ISIS bureaucracy and records, the Cooperating Witness is expected to state that the documents presented in this case appear to be very similar to documents he prepared or worked on as part of his administrative responsibilities for ISIS.

Foreign Captured Enemy Material (CEM) Coordinator Witness:  The government would call a foreign CEM Coordinator who received battlefield evidence from two military operations undertaken by Coalition Forces  on June 28, 2017, in the vicinity of Mosul, Iraq, and on December 27, 2017, in the vicinity of Rayhaniyah, Dashisha District, Haskalah Province, Syria. This witness is expected to describe the items seized during that operation.   The witness will testify that one of the documents contained in the electronic media seized during that operation was a roster of ISIS members, including the stipends paid to them, their units and tabs listing the children and other dependents of ISIS members as well as their personal information.   The witness is expected to testify that this roster contained information about the defendant and his dependents.

Shawn Peters:  Mr. Peters is a Special Agent of the Federal Bureau of Investigation who has served as the FBI's Senior Liaison officer at the National Media Exploitation Center (hereinafter referred to as "NMEC") since May of 2023.  He is expected to describe NMEC as a repository for information acquired, seized or captured overseas and his duties at NMEC as a facilitator for requests from agencies and units inside and outside the United States to gather information collected at NMEC.  He will testify about the nature of the information obtained by NMEC, how information is acquired and thereafter, how it is handled once it has been provided to NMEC.  He will explain how information is inputted into, stored and used in the NMEC databases.  Special Agent Peters will describe the assistance he provided to special agents and intelligence analysts in the United States, as well as to foreign partners and allies requesting help in finding information in NMEC holdings for investigative needs or judicial proceedings.  He is also expected to discuss a specific computer program called Harmony, which contains a small

percentage of the information collected by NMEC, and which is available for members of the intelligence community to access and analyze remotely.

Michael Merletti:  Mr. Merletti is a Supervisory Special Agent of the FBI who had been assigned as the original case agent for the investigation of the defendant.  Supervisory Special Agent Merletti is expected to testify about how he learned of the existence of certain foreign language documents and video evidence relating to the defendant that reflected the defendant's activities with ISIS overseas.  Supervisory Special Agent Merletti will describe the steps he took to retrieve these documents and video evidence from the Harmony database or other NMEC database.  He will discuss his review of these items and explain the basis for concluding that they included information relating to the defendant.   Supervisory Special Agent Merletti will also testify about the context for the video evidence that contains images of the defendant and is expected to testify about statements made by the defendant related to this video during a voluntary interview he gave to the FBI on April 21, 2019.  Additionally, SSA Merletti is expected to testify about how the FBI obtained custody of documents from UNITAD that relate to the defendant.

> C.  Basis for Admissibility of ISIS Evidence

> 1. The ISIS Documents are Admissible as Co-Conspirator Statements
>    Under FRE 801(d)(2)(E).

The defendant has been charged with conspiring with others to provide material support to ISIS in the form of personnel and services from at least November 2015 through February 2019. The government offers the ISIS documents for admission as non-hearsay co-conspirator statements made during and in furtherance of the conspiracy, pursuant to FRE 801(d)(2)(E).  As the Supreme Court has noted, in order to admit such evidence, the district court must find by a preponderance of the evidence that a conspiracy existed and that the defendant and the declarant

were members of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). In considering whether a conspiracy exists under FRE 801(d)(2)(E), "[t]he key is coordinated action." 30B CHARLES ALAN WRIGHT & JEFFREY BELLIN, FEDERAL PRACTICE AND PROCEDURE § 6778 (2022 ed.). Although *Bourjaily* allowed courts to consider the content of the out-of-court statements to make the determination of whether a conspiracy exists and left open whether the statements alone could support the finding, this Circuit has held that the court's admissibility finding must rest on some independent evidence of the conspiracy. *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) (citing cases). The government need not prove the agreement by direct evidence, as it may be "inferred from the facts and circumstances of the case." *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975); *United States v. Morris*, 836 F.2d 1371, 1373 (D.C. Cir. 1988) ("[S]ince a conspiracy is by nature secret, the jury may fairly infer the existence of the agreement through either direct or circumstantial evidence."); *United States v. Paitsel*, Crim. Action No. 19-156-2 (CKK), 2023 WL 2139366 at *4 (February 21, 2023). The court can consider the indictment itself to determine the scope of the conspiracy. *United States v. Musaibli*, 42 F.4th 603, 615 (6th Cir. 2022); *cf. United States v. Squillacote*, 221 F.3d 542, 563 (4th Cir. 2000). Moreover, a court can rely on the statements of a defendant charged with conspiracy to show a co-conspirator's agreement to the conspiracy. *See United States v. Alebbini*, 979 F.3d 537, 546 (6th Cir. 2020).

The Sixth Circuit Court of Appeals recently considered the government's request to admit ISIS documents against a defendant who, like Sylejmani, was charged with conspiracy to provide material support to ISIS and receiving military-type training from ISIS. The Court held that the documents were admissible as co-conspirator statements, pursuant to FRE 801(d)(2)(E). *United States v. Musaibli,* 42 F.4th 603. The *Musaibli* court noted that many of the documents presented

14

identified the defendant and others as members of a specific fighting battalion.  The court also took into account that the defendant's own words supported the existence of a conspiracy to provide personnel and services to ISIS.  In that case, the defendant provided a detailed confession, describing how he and others completed training and swore allegiance to ISIS as part of their enrollment in their fighting unit.  He also sent messages to his relatives informing them that he was helping in ISIS's broader fight against Americans and Shia Muslims.  *Id.* at 616.  The Sixth Circuit credited the testimony of a former member of ISIS who had served as a database administrator for the fighting unit where the defendant was assigned for some time.  This witness's testimony about the database entries for the ISIS documents helped to establish that "an intricate conspiracy to provide ISIS with personnel and services existed, that this conspiracy was supported by a sophisticated bureaucratic apparatus that kept track of its members and incentivized their service through salaries and other benefits, and that Musaibli was one such member."  *Id.* at 617.  The Sixth Circuit concluded that "statements generated by ISIS's bureaucratic apparatus to support the mission of providing the terrorist group with personnel and services . . . fit comfortably within the alleged conspiracy's scope."  *Id.* at 618.  The *Musaibli* court also found that the ISIS documents constituted statements in furtherance of the conspiracy alleged in the indictment.  As the Sixth Circuit reasoned:

> "statements which identify the participants and their roles in the conspiracy are made 'in furtherance' of a conspiracy….[B]ecause statements identifying Musaibli was an ISIS fighter attest both to the services that Musaibli agreed with others to render to the terrorist groups and how the group managed its personnel, they further the conspiracy with which he is charged."

*Id.* at 619.

Here, as in *Musaibli,* several of the proffered ISIS documents identify the defendant and contain specific personal information about him and members of his family.  The documents

reflect the defendant's ISIS census number, his kunya, his date of birth and his claimed country of origin, and his assigned battalion.  The documents include information about his marital status, the name of his wife, and the names of his children.  Here, as in *Musaibli,* the defendant provided an extensive interview to the FBI after he was captured by the Syrian Defense Forces.  During that interview, the defendant recounted in detail his radicalization, his plans for joining ISIS, his travel to Syria with his family, his continued travel inside Syria with other like-minded recruits committed to joining ISIS, the intake process during which he provided identification information for himself and his family to an ISIS member when he arrived at the first safehouse in Syria, his training shortly after he joined the organization, his pledge of allegiance to ISIS at the conclusion of his training, and his military assignments following that training.  During the interview with the FBI, the defendant also identified himself in a video taken in Syria, which, according to the defendant, also included images of numerous other men who were members of ISIS.  The defendant, as in *Musaibli*, sent messages to members of his family outside of Syria, advising them of his whereabouts and activities in Syria.  Here, as in *Musaibli,* the government expects to offer as one of its witnesses a former member of ISIS who had served in a Human Resources unit and was responsible for, among other duties, creating spreadsheets containing personal data of ISIS members and their families for the purpose of ensuring payment of salaries and living expenses to ISIS members.   All of this evidence, taken together, establishes the existence of a conspiracy among the defendant and other individuals with a common goal of providing material support, in the form of personnel, to ISIS, a designated foreign terrorist organization.  In the context of this case, the ISIS documents are clearly admissible against the defendant as co-conspirator statements pursuant to FRE 801(d)(2)(E).

      2.   Even If Deemed to be Hearsay, the ISIS Documents are Admissible Under FRE 807.

16

The government submits that if the Court determines that the ISIS documents are hearsay statements rather than statements of co-conspirators, the documents may not qualify for any hearsay exception category listed in FRE 803 or FRE 804.  Even if these documents are not admissible under a hearsay exception in FRE 803 or FRE 804, however, Rule 807 provides that a hearsay statement should not be excluded by the rules against hearsay if:

> "(1) the statement is supported by sufficient guarantees of trustworthiness ---
> after considering the totality of circumstances under which it was made and
> evidence, if any, corroborating the statement; and
> (2) it is more probative on the point for which it is offered than any other
> evidence that the proponent can obtain through reasonable efforts."

The rule governing residual exceptions to the hearsay rule has been recognized to have "a significant purpose and substantial vitality of its own," described as "encourag[ing] the progressive growth and development of federal evidentiary law by giving courts the flexibility to deal with new evidentiary situations which may not be pigeon-holed elsewhere." *United States v. American Telephone and Telegraph Co.,* 516 F. Supp. 1237, 1240 (D.D.C. 1981) (discussing predecessor rule and quoting *United States v. Mathis,* 559 F.2d 294, 299 (5th Cir. 1977)).  This Circuit has recognized that the Federal Rules of Evidence Advisory Committee noted that the hearsay exceptions listed in Rules 803 and 804 "reflect the most typical and well recognized exceptions to the hearsay rule," but "may not encompass every situation in which the reliability and appropriateness of a particular piece of hearsay make clear that it should be heard and considered by the trier of fact." *United States v. Slatten,* 865 F.3d 767, 807 (D.C. Cir. 2017) (quoting FRE 803(24) advisory committee's note to 1974 enactment), *cert. denied sub nom. Slough v. United States,* 138 S.Ct. 1990 (2018).

The Circuit has also held that the residual exception is to be narrowly construed to apply only to "very important and very reliable" evidence.  *Slatten,* 865 F.3d at 807 (quoting *United*

17

*States v. Washington,* 106 F.3d 983, 1001 (D.C. Cir. 1997) (per curiam)).  Accordingly, the

Circuit has observed that the residual exception should be available to admit hearsay statements

only in exceptional circumstances.  *Slatten,* 865 F.3d at 807; *accord United States v. Smith,*

Crim. No. 19-324 (BAH), 2020 WL 5995100 at *5 (D.D.C. Oct. 10, 2020).

 The government submits that the ISIS documents present such an exceptional

circumstance that warrants their admission under FRE 807.  The ISIS documents present a new

evidentiary situation "which may not be pigeon-hold elsewhere."  *Mathis,* 559 F.2d at 299.   The

documents reflect circumstantial guarantees of trustworthiness upon which the Court should rely.

There are ample reasons to conclude that the declarants whose information is contained in the

ISIS documents were "particularly likely to be telling the truth when the statement was made."

*Washington,* 106 F.3d at 1002.  The declarants provided that information about themselves and

their families in an effort to obtain monetary support in exchange for their service with ISIS.

The numerous ISIS documents contain similar information obtained from other declarants in

order to maintain reliable records of the fighting force and their dependents, and in order to

account for disbursements to those declarants.  The inclusion in these documents of information

relating to the defendant for this purpose is corroborated by his own statements to the FBI after

his arrest.  Testimony from the cooperating witness, a member of ISIS responsible for the

creation of such documents, further corroborates the circumstances and purpose for eliciting that

information from the declarants and the use of the information by ISIS.  Evidence reflecting

where these documents were found further corroborates the assertion that these are ISIS

documents containing information about ISIS members, such as the defendant.

 The nature of this evidence establishes that it is more probative on the point for which it

is offered than any other evidence that could be obtained through reasonable efforts.  The ISIS

documents provide unique support for the proposition that the defendant was, in fact, a fighter for ISIS. The documents reflect unique information about the defendant and other ISIS fighters, including his "kunya" and his ten-digit ISIS census number. Only those who swore allegiance to ISIS received an identification or census number. *See Musaibli,* 42 F.4th at 607. Testimony concerning the circumstances of the discovery of each group of documents further establishes that this evidence obtained in Iraq and Syria after the fall of ISIS is more probative of the defendant's involvement with ISIS during that critical time frame than other non-documentary evidence could be. *See generally United States v. Dumeisi,* 424 F.3d 566, 575-76 (7th Cir. 2005) (Iraqi Intelligence Service records contained in "The Baghdad File" properly admissible under FRE 807).

## IV.    Conclusion

Wherefore, for the reasons stated above, the government submits that the proffered ISIS documents are both authentic and admissible and requests that the Court hold an evidentiary hearing before trial to determine the admissibility of the ISIS documents.

Respectfully submitted,

MATTHEW M GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/Brenda J. Johnson*
Brenda J. Johnson
D.C. Bar No. 370737
Steven B. Wasserman
D.C. Bar No. 453251
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7801 -Johnson
(202) 272-7719-Wasserman
Brenda.Johnson@usdoj.gov
Steve.Wasserman@usdoj.gov

Jennifer E. Levy
D.C. Bar No. 291070
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530

## CERTIFICATE OF SERVICE

I hereby certify that, on November 20, 2023, I caused a copy of this motion to be served, via ECF upon counsel for the defendants, Ubong Akpan and Sabrina Shroff.


*/s/ Steven B. Wasserman*
*/s/ Brenda J. Johnson*