**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **United States of America,** | |
| **v.** | **Case No. 20-cr-106 (RC)** |
| **Lirim Sylejmani,** | |
| **Defendant.** | |

### LIRIM SYLEJMANI'S RESPONSE TO UNITED STATES' MOTION IN LIMINE TO ADMIT ISIS DOCUMENTS

The government has moved to admit a number of documents that it believes are records of the Islamic State (ISIS). These documents, according to the government, consist of Excel spreadsheets of payroll and roster data of ISIS, and generally include the following information: "(1) the ISIS member's name; (2) census number; (3) kunya (or nom de guerre); (4) number of wives; (5) number of children; (6) monthly stipend payments received by the ISIS member; and (7) assigned battalion." *See* Gov't Mot., ECF No. 39 at 5. These documents were purportedly found by either Iraqi-military forces or unspecified units within the Coalition Forces throughout Iraq and Syria. *Id.* at 4.

The government should be precluded from introducing such evidence on at least four independent grounds: (1) the documents fail to meet the translation requirements set out in FRE 604; (2) the government's proffer has not laid the necessary foundation to authenticate these alleged ISIS documents as required by FRE 901; (3) the documents are hearsay; and/or (4) no hearsay exception applies.[1]

---

[1] Mr. Sylejmani reserves the right to submit supplemental briefing after the hearing on this matter, given that the government's motion has proceeded by proffer and it is unclear what the evidence will ultimately show.

1

**ARGUMENT**

### A. The Government's Proffered Exhibits Violate Rule 604 Because They Lack a Translation Certification

Federal Rule of Evidence 604 requires that "[a]n interpreter must be qualified and must give an oath or affirmation to make a true translation." *Id.* The documents the government has submitted in its motion in limine fail to identify who prepared the English translation or the qualifications of the translator. Since the identity of the person who interpreted the documents is not provided, there is no way for this Court to determine the qualifications or impartiality of the translator. *See, e.g.*, *United States v. Ball*, 988 F.2d 7, 9 (5th Cir. 1993); *United States v. Addonizio*, 451 F.3d 49, 68 (3d Cir. 1971) (reciting the longstanding principle that an interpreter must not have an interest in the outcome of a proceeding). The lack of qualified translation violates FRE 604. Further, it is improper and prejudicial in this case, given that the government is relying upon the purported statements in the documents to support its arguments relating to authentication, co-conspirator's statements, and the residual clause exception.

### B. The Government's Proffered Exhibits Violate Rule 901 Because the Government Has Failed To Lay The Required Foundation For Their Admission

Authentication is a condition precedent to admissibility. *United States v. Khatallah*, 41 F.4th 608 (D.C. Cir. 2022). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Here, the government tries to authenticate the alleged ISIS documents in two ways: (1) through "testimony of a witness with knowledge" under Rule 901(b)(1); and (2) through "distinctive characteristics and the like" under Rule 901(b)(4). *See id.* at 7. The government fails on both grounds.

Beginning with "testimony of a witness with knowledge" under Rule 901(b)(1), the advisory committee note to this subsection makes it clear that the drafters intended a witness

with knowledge to be a fact witness who could attest to the authenticity of the evidence.  *See* Adv. Comm. Note, Rule 901(b)(1) (2011); *see also United States v. Owens*, 484 U.S. 554, 562 (1988) (invoking Advisory Committee note in interpreting Federal Rules of Evidence).  The examples given in the relevant Advisory Committee Note include a witness present when a document was signed, or a witness who establishes the chain of custody from the seizure of narcotics from a defendant.  *See* Adv. Comm. Note, Rule 901(b)(1) (2011).

The government identifies six witnesses it intends to call to authenticate the documents. Based on the proffer provided in the government's motion, however, it appears that none of these witnesses have any of the applicable knowledge required to authenticate a document under Rule 901.  None of the six witnesses were personally involved in the creation of these documents, nor were they present when the documents were originally taken from the scene or cataloged into the government's system.  Indeed, it appears most of the government's purported "authentication" witnesses did not even see the respective documents until this prosecution.  Given their lack of applicable knowledge, it is unclear whether any of these government witnesses will be able to vouch for the genuineness, accuracy, and integrity of these documents.  Rather, most of these individuals appear simply to have reviewed a number of documents they believe to be genuine ISIS records and will try to testify that those documents and these documents are similar.  That is insufficient under Rule 901(b)(1).  *See, e.g., United States v. Lawson*, 494 F.3d 1046, 1052 (D.C. Cir. 2007) (finding lower court's exclusion of photograph evidence proper because no witness could testify that the photograph "accurately depicts the scene it purports to represent"); *United States v. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970) ("A writing is not authenticated simply by attaching it to an affidavit, even if the writing appears on its face to have originated from some governmental agency and the affiant is a government official.  The foundation is laid for

3

receiving a document in evidence by the testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document and, where appropriate, its delivery."); *United States v. Perlmuter*, 698 F.2d 1290, 1293 (9th Cir. 1982) (reversing lower-court's decision to introduce Interpol documents "based on the documents' 'aura of authenticity'").

In *Griffin v. Bell*, 694 F.3d 817 (7th Cir. 2012), for example, the Seventh Circuit explained that a person with knowledge is an individual who can attest to how a piece of evidence was produced. *Id.* at 826.  The *Griffin* court ultimately excluded video evidence showing an altercation between a security guard and a student, despite the student's attempt to authenticate the video (along with still shots taken from it) as accurately depicting the event. *Id.* The court determined the student was not a "witness with knowledge" because "he could not say how the video was made, or whether it had ever been altered." *Id.* at 827.  In this case, the government's proffered witnesses appear to be able to provide even less testimony than the student in *Griffin*.  The student at least had first-hand knowledge of the incident captured on the video. Here, by contrast, the government's witnesses were not there, will likely not be able to attest to (i) the underlying accuracy of the records; (ii) how or why they were made; (iii) who in ISIS is alleged to have made them; (iv) how they were found; (v) by whom in the Coalition Forces they were found; (vi) whether they have been altered; (vii) the chain of custody of those records between being found and being cataloged into the system; and/or (viii) who cataloged them into the system. All these facts, however, bear directly on the proposed witness's ability to properly attest that the documents at issue are true, accurate, and unaltered.

The government also attempts to rely on FRE 901(b)(4), involving "distinctive characteristics and the like," based primarily on the contents of the documents and circumstances

of their recovery.  *See* Gov't Mot. at 7-8.  For support, the government relies upon numerous out-of-circuit cases, including *United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009) and *United States v. Skiljevic*, 2013 WL 3353960, at *3-4 (E.D. Wis. July 3, 2013).  These cases are readily distinguishable. In them, the government presented far more testimony from individuals with first-hand knowledge of the particular evidence than it has proffered here, including testimony from witnesses who participated in the original search and seizure of the documents and testimony about how that particular individual helped maintain the chain of custody of the documents.  *See, e.g.*, *Vidacak*, 553 F.3d at 348 (admitting Zvornik Brigade military records in Bosnia seized from Zvornik Brigade headquarters after the testifying officer "who participated in the search of the Zvornik Brigade headquarters" explained "how the documents were seized and taken to the War Crimes Tribunal in The Hague, where they were later identified"); *Skiljevic*, 2013 WL 3353960, at *3-4 (admitting military records provided by the International Criminal Tribunal for the Former Yugoslavia where the documents "have been certified by the ICTY as official records gathered, stored, and maintained by the ICTY" and a witness testified that he "was personally involved in the retrieval of the documents from the Zvornik Brigate Headquarters," and described "how the documents were seized, how they were secured and transported to the ICTY, and how he participated in cataloguing the documents.").

The government also relies heavily upon *United States v. Musaibli*, 42 F.4th 603 (6th Cir. 2022), but that case too undermines the government's argument, given how much *more* first-hand evidence the government presented in that case to authenticate the documents.  There, the government presented testimony from a cooperating witness who, during "his stint in ISIS," "served as a database administrator," who personally "helped collect and manage information about members of the battalion" (including fighters' names, families' names, birthdates, ISIS-

5

issued identification numbers, and the number of children that they had), and specifically recalled speaking with the defendant and inputting data related to him into the database. *See id.* at 611. Moreover, the cooperating witness testified that some of the government's exhibits were "formatted exactly the same as reports that he regularly printed," and noted that a document even had a distinctive "purple streak down the page" caused by the defective printer he used. *United States v. Musaibli*, 577 F. Supp. 3d 609, 618 (E.D. Mich. Dec. 28, 2021), *rev'd on other grounds by* 42 F.4th 603 (6th Cir. 2022). Based on the government's proffer, it will not be able to produce anything nearly as distinctive in this case, rendering its reliance on *Musaibli* entirely misplaced.

That multiple documents appear to contain information arguably consistent with identifying information of Mr. Syljemani is not enough to satisfy the Government's requirement to authenticate these documents as unaltered and authentic ISIS documents. The relevant Commentary makes it clear that the "distinctive characteristics and the like" that provides authenticity and admissibility to a document is the substantive content within that document that could only be known to a limited number of persons. *See* FRE 901, Advisory Committee Notes, 1972 Proposed Rules, Notes to Subdivision (b), Example (4). In *United States v. Mitts*, for example, the Sixth Circuit held that an alleged advertisement for the defendant's business containing his name, telephone number, and address should not have been admitted to trial because anyone could have gathered that information and created a flier. 396 Fed. Appx. 296, 302 (6th Cir. 2010) (unpublished). That same reasoning and result applies here.

The foregoing concerns are amplified here. There is great reason to doubt the accuracy and reliability of ISIS records. Undersigned counsel anticipates even the government witnesses will agree ISIS had no measures for ensuring the reliability and accuracy of its record keeping

and had great incentives to inflate its appearance of strength through exaggerating the number of its members, even if not accurate.  In fact, reputable news organizations such as the New York Times have had to retract prior articles that relied on alleged ISIS documents which turned out to be fabricated and fake.  *See* Smith, Sydney*, NYT Editor's Note: ISIS Receipts May not Be Real*, *iMediaEthics* (Nov. 18, 2019), available at https://perma.cc/8KNQ-883G.  Given all this, the mere fact that the documents were purportedly found by Coalition Forces in or around ISIS territory, and purportedly contained publicly available information about Mr. Sylejmani (*e.g*., his name and number of children) at the time they were found, is insufficient. Because the government cannot lay the necessary foundation required under Rule 901, the records should be excluded.

**C. The Documents Should Not Be Admitted as Co-Conspirator Statements, As the Maker And Circumstances Relating To The Documents' Creation Appear To Be Unknown And There Are Serious Doubts Relating To Their Accuracy**

The government mistakenly contends these documents are admissible as non-hearsay co-conspirator statements under Rule 801(d)(2)(E). Gov't Mot. at 13. This narrow rule does not apply here, however, for two independent reasons.  First, the government has failed to lay a sufficient foundation that the statements were made as part of a conspiracy. Second, the probative value of this unreliable evidence—where the maker and circumstances in the creation of the documents are unknown—is substantially outweighed by a danger of unfair prejudice under Rule 403.

**i. The government has failed to proffer a sufficient foundation to admit the purported co-conspirator statements under Rule 801(d)(2)(E)**

Rule 801(d)(2)(E) authorizes the admission of an out-of-court statement if it "was made by the party's coconspirator during and in furtherance of the conspiracy." *Id.*  To classify a conspirator statement as non-hearsay under Rule 801(d)(2)(E), the government must establish the

following facts: (1) that a conspiracy existed; (2) that the defendant was a member of the conspiracy; and (3) that the coconspirator's statement was made during and in furtherance of the conspiracy. *See United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006). The elements of conspiracy, in turn, require the government to "show that the defendant agreed to engage in criminal activity and knowingly participating in the conspiracy with the intent to commit the offense, as well as that at least one overt act took place in furtherance of the conspiracy." *United States v. Hemphill*, 514 F.3d 1350, 1362 (D.C. Cir. 2008) (internal quotation marks omitted). To establish the above elements, the government must rely upon "some independent evidence of the conspiracy," rather than solely the out-of-court statement made by the purported co-conspirator. *See Gewin*, 471 F.3d at 201.

The D.C. Circuit has long held that statements made after a conspirator has withdrawn from the conspiracy are inadmissible under this hearsay exception. *See, e.g.*, *United States v. Mardian*, 546 F.2d 973, 978 n.5 (D.C. Cir. 1976) ("Had Mardian withdrawn, the declarations of coconspirator uttered after the date of his withdrawal would not be admissible against him"); *United States v. Perholtz*, 842 F.2d 343, 356 (D.C. Cir. 1988) (statements made "during a subsequent period when the coconspirators were engaged in nothing more than concealment of the criminal enterprise" were inadmissible as not in furtherance of conspiracy).

Here, the government has not provided a sufficient foundation to establish the threshold elements that Mr. Sylejmani joined a conspiracy; nor has it provided a sufficient foundation relating to the scope of the conspiracy which Mr. Sylejmani allegedly joined. Both are required to determine if the proffered exhibits are admissible as statements *during* and in *furtherance* of the conspiracy. It cannot be the case that any support of ISIS equates to joining the broadest form of a conspiracy involving the Islamic State, opening the door to *any* statement made by any

8

member of ISIS anywhere, no matter how attenuated the statement is from the defendant. In other words, there must be a limit to the proper use of Rule 801(d)(2)(E). *See United States v. Bibbero*, 749 F.2d 581 (9th Cir. 1984) ("To come within the co-conspirator exception, the evidence must indicate that the statement furthered the common objectives of the conspiracy; 'mere conversation between conspirators' is not admissible."); *State v. Rolon*, 146 Idaho 684, 695 (2008) ("[W]e find the approach of the Ninth Circuit, which has taken a narrower view of the issue, to be more" persuasive than the Sixth and Eighth Circuit's broad interpretations of Rule 801(d)(2)(E)).

Not only is there lacking proof that Mr. Sylejmani joined a conspiracy (whatever its scope), the documents here appear to have unknown sources, so there is also lacking proof that the document's creator was a member of the conspiracy. Without knowing the alleged co-conspirator or circumstances leading to the creation of the document, there is lacking foundation relating to (i) whether the documents were created during or in furtherance of the conspiracy; (ii) whether the statements could be classified as testimonial thereby triggering the Confrontation Clause; and/or (iii) whether the purported exchange was in furtherance of an agreed conspiracy or amounted to mere idle chatter. *Bibbero*, 749 F.2d at 584 ("mere conversation between conspirators" not admissible under Rule 801(d)(2)(E)). Hence, the government's request to admit these exhibits under the co-conspirator exception is premature given that they have not proffered sufficient evidence to meet the threshold requirements of Rule 801(d)(2)(E).

### ii. Even if admissible, these statements should be excluded under Rule 403

Even assuming, for the sake of argument, that these documents are admissible under Rule 801(d)(2)(E), the Court still should exclude them under Rule 403. Courts and academic commentators have strongly questioned Rule 801(d)(2)(E) for years, calling it everything from

an "embarrassment" to "odd and artificial." *See* Robert B. Humphreys, Note, *In Search of The*

*Reliable Conspirator: A Proposed Amendment to Federal Rule of Evidence 801(d)(2)(E)*,

30 Am. Crim. L. Rev. 337, 338 & nn.2–6 (1993); Thomas J. Scorza, *Problems with Co–*

*Conspirator Hearsay*, 16 Litigation 30 (Winter 1990) ("If you are not impressed by this [agency]

theory, you are not alone."); Christopher Mueller and Laird Kirkpatrick, *Modern Evidence:*

*Doctrine and Practice* § 8.33, t 1200 (1995) ("Much has been written on the subject, and

commentators are largely critical of the exception"); Frederic L. Borch III, *The Use of Co-*

*Conspirator Statements Under the Rules of Evidence: A Revolutionary Change in Admissibility*,

124 Mil. L. Rev. 163, 189 (1989) ("[A] by-product of such admissibility [under Rule

801(d)(2)(E)] is that statements of inherent unreliability are received into evidence").  This

trenchant criticism is particularly appropriate in this case, where the source of the information

and circumstances surrounding the creation of the document appear to be unknown.  The creator

of the document will never have to appear in Court to testify under oath and be subject to cross-

examination, thereby thwarting the Rules of Evidence's fundamental, overarching goal of

"ascertaining the truth and securing a just determination."  Fed. R. Evid. 102.

Courts readily exclude otherwise admissible evidence under Rule 403.  In *Mister v.*

*Northeast Illinois Commuter R.R. Corp*, for example, the Seventh Circuit upheld the exclusion of

a non-hearsay admission of a party opponent (Rule 801(d)(2)(D)) under Rule 403:

> Fed. R. Evid. 403 requires that a district court determine whether the prejudicial effect of admitting such evidence outweighs its probative value and thereby renders it inadmissible. *Aliotta*, 315 F.3d at 763. What we have here is a non-hearsay report that is derived from multiple levels of hearsay. Although the report stated that a similar fall occurred in the "same spot," no one knew what spot. No one knew exactly where Wyman had fallen and there is absolutely no basis to conclude that Mister slipped and fell in the same location as Wyman.
>
> Although it would have been proper to admit the report and allow Metra to expose the statement's unreliability on cross-examination, it was not improper to find the report unreliable based on the multiple levels of hearsay and lack of precise factual

statements.

*Mister*, 571 F.3d 696, 699 (7th Cir. 2009).

Like the accident report at issue in *Mister*, the records and reports here rely on multiple levels of hearsay from unknown persons, and mere guesses as to the circumstances under which they were created.  And, all this where ISIS took no measures for ensuring the reliability and accuracy of its recordkeeping.  For all these reasons, the Court should exercise its discretion and decline to admit the documents under Rule 403.

### D.  The Government's Reliance Upon Rule 807's Residual Exception Is Misplaced

As a fallback, the government invokes the residual exception to the rule against hearsay found in Federal Rule of Evidence 807.  This "exception is to be used only rarely, in truly exceptional cases."  *United States v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005); *United States v. Trujillo*, 136 F.3d 1388, 1395 (10th Cir. 1998) (because residual hearsay exception is intended to be used "very rarely and only in exceptional circumstances," the government bears the "heavy burden" of presenting trial court with sufficient indicia of trustworthiness); *see also* S. Rep. No. 93-1277, at 36 (1974) ("It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances.").

Rule 807 states that

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay exception in Rule 803 or 804: (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807. This rarely used rule is inapplicable here.

For starters, the documents lack sufficient guarantees of trustworthiness.  As discussed above, none of the government's proffered witnesses appear to have first-hand knowledge of the

how the documents were created, by whom, when, or can testify about the integrity of the documents. Even the alleged co-conspirator the government proffers as a potential witness—who is charged with serious crimes and has every incentive to implicate others (irrespective of the accuracy of the implication) and exonerate himself—likely lacks the first-hand knowledge necessary to vouch for the accuracy of the specific documents at issue.

There are also serious grounds for concern about the accuracy of ISIS records in general. As discussed above, the identifying information of Mr. Sylejmani contained in the documents (*e.g.*, name and number of children) is publicly available and easily falsified anywhere in the chain of custody. Undersigned counsel anticipates that the government's witnesses themselves will testify that ISIS's record keeping is often inaccurate and incomplete, and its numbers and members inflated. Indeed, the fact that the government does not even attempt to argue these documents are trustworthy enough to meet the business records exception demonstrates that the government has failed to meet its heavy burden of presenting "sufficient guarantees of trustworthiness" to merit the documents' admission under FRE 807's residual exception. *See United States v. Houser*, 746 F.2d 55, 62 (D.C. Cir. 1984) ("Here, an examination of the procedures followed in compiling the BATF form leads inexorably to substantial concern over the total lack of 'indicia of reliability' and 'circumstantial guaranties of trustworthiness.' That uneasiness is compounded by the fact that the specific requirements of the business records exception, requirements designed to assure that reliability and trustworthiness, were not met.").

For all these reasons, the Court should not admit the documents at issue under Rule 807.

<div align="center">

**CONCLUSION**

</div>

For each of the reasons discussed above, the Court should (i) deny the government's motion in limine seeking to introduce several purported ISIS documents; and (ii) grant Mr.

<div align="center">12</div>

Lirim Sylejmani such other and further relief as the Court deems just.

<div style="margin-left: 50%;">

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

    */s/*
Ubong E. Akpan
Assistant Federal Public Defender
Federal Public Defender's Office
625 Indiana Ave, NW, Suite 550
Washington, D.C. 20004

 and

    */s/*
Sabrina P. Shroff
80 Broad Street
19th Floor
New York, NY 10004

*Attorneys for Mr. Lirim Sylejmani*

</div>