**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.    20-CR-106 (RC)** |
| | : | |
| **v.** | : | |
| | : | |
| **LIRIM SYLEJMANI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's Motion to Suppress Statements (ECF #52).    In support of this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing regarding motions.

## I.    Factual and Procedural Background

The defendant, Lirim Sylejmani, was born in Gjilan, Kosovo, on February 7, 1976.    In approximately 2000, he moved to Chicago, Illinois, and thereafter, sought citizenship based on his refugee status arising from, according to his immigration file, "ethnic cleaning by Serbs."    The defendant subsequently became a naturalized United States citizen.    In approximately 2002, he began living with Polish citizen Karolina Katarzyna Suchojad and had several children with her. In the spring of 2011, he left the United States with his family and returned to Kosovo.    He and his family moved to Canada several months later, where they remained until 2015.    During his time in Canada, the defendant began to embrace Islam.    By the fall of 2014, the defendant began considering moving his family to join ISIS.    Suchojad converted from Catholicism to Islam and

reportedly agreed with the defendant's plan to join ISIS.[1]    In May 2015, the family moved back to Kosovo.    In order to join ISIS, the defendant worked with an active ISIS member to receive Tazkiyah, or official vouching.    Thereafter, the defendant surrendered to that ISIS member the United States passports issued for him and his family and received false Syrian identification documents to use for travel to join ISIS.    The defendant was then connected with a smuggler who helped him and his family enter Syria and join ISIS.    In early November 2015, the family flew to Istanbul, Turkey, and ultimately crossed the Turkish-Syrian border to join ISIS.

Beginning in January 2016, the defendant communicated with his Kosovo-based sister, using Viber and then Surespot.    In mid-January 2016, the defendant told his sister that he and his family were "in the Islamic State."    When his sister asked whether he was working there, the defendant responded, "No not for the moment …. I had some training to finish and now I am looking."    His sister asked, "Are you in the war zone … Or in another state."    The defendant replied, "Now close to Mosul."    When his sister asked if the defendant was satisfied there, the defendant responded, "I have never been happier."    Although his sister asked the defendant to return to Kosovo with his family "before something bad happens," the defendant replied, "Don't worry because you will change nothing.    Pray to Allah and hope to meet one day when the world will be free from the infidels."

---

[1] ISIS is a foreign terrorist organization that has been designated as such by the United States Secretary of State in some form for almost 20 years.    In 2004, the Secretary of State designated Al Qaeda in Iraq ("AQI") as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under Section 1(b) of Executive Order 13224.    In 2014, this designation was amended to add the alias of Islamic State of Iraq and the Levant ("ISIL") as its primary name.    The Secretary also added ISIS and a number of other aliases to the foreign terrorist organization designation.

Shortly after entering Syria, the defendant completed his ISIS intake process at an ISIS guesthouse.   He took on the name Abu Sulayman al-Kosovi and began initial entry training with other ISIS recruits on approximately November 22, 2015.   The defendant, his family, and other ISIS recruits moved to Mosul, Iraq, in late November 2015.   In December 2015, the defendant began his ISIS military and Sharia[2] law training.   Before graduating from ISIS military training in mid-December 2015, the defendant pledged "bayat," or allegiance, to the leader of ISIS and to ISIS as an organization.   Upon completion of his military training, the defendant was assigned to the ISIS battalion in Mosul, Iraq, and was issued his own AK-47, four AK-47 magazines, a belt to hold the magazines and two grenades.   In the spring of 2016, the defendant was paid by the ISIS administrative officer in Iraqi Dinar for his first three months of service.   In May of 2016, the defendant reported for guard duty, called "ribat," on the front line of a military operation undertaken by the Syrian Defense Forces ("SDF") against ISIS at the city of Manbij, Syria.   He continued to serve as a fighter for ISIS until he was injured in a battle with Coalition Forces in June 2016.   After recovering from his wounds, the defendant was eventually reassigned to a new battalion in the fall of 2017 and was paid for his services during that time.   Between November 2017 and February 2019, the defendant and his family moved southeast to Baghouz, Syria, as the territorial Caliphate of ISIS collapsed.   On February 27, 2019, the defendant and his family were captured by Coalition Forces in Baghouz.   The defendant was then incarcerated by the SDF in Syria at the Dashisha prison from approximately late February 2019 to May of 2019, and then

---

[2] "Sharia" is a body of religious law of Islam.   It constitutes a system of duties that are incumbent upon all Muslims by virtue of their religious belief.

transferred to the Al-Hassakah prison where he remained until he was transferred to United States law enforcement personnel on September 15, 2020, to face criminal charges in this District.

      *A.*      *Un-Mirandized Biometric Interview of Defendant by FBI on March 31, 2019*

On March 31, 2019, while incarcerated at Dashisha prison, the defendant was biometrically enrolled[3] by FBI Special Agents Phillip Coonfield and Zachary Kiminas.[4]  Also present during the enrollment meeting were Special Agent Paul Sok of the FBI and an FBI language specialist. SDF officials escorted the defendant into an interview room but did not remain during the enrollment processing.  The defendant advised the FBI that he spoke English, and the agents advised defendant of their identities and the nature of the interview.  The agents did not advise the defendant of his *Miranda*[5] warnings at any point during the interaction[6.]  According to the agents, the defendant voluntarily answered questions which generally consisted of whether he was aware of any imminent threats to SDF or Coalition Forces or attacks against U.S. or Western countries.  The defendant further advised that he was unaware of any impending operations by members of ISIS in Iraq or Syria, nor was he aware of any American hostages or hostages of any

---

[3]  During a biometric enrollment interview, the FBI agents collect biographical information from the detainee, including fingerprints.  The interviewing agents would also typically interrogate the detainee to collect intelligence, including whether the detainee was aware of any impending threats to civilian or military targets.

[4] The government does not seek to admit this statement in its case-in-chief at trial; however, we reserve the right to seek its admission should the defendant present evidence at a motions, hearing or trial that is materially inconsistent with the statements he made to law enforcement during this interview.

[5]  *Miranda v. Arizona,* 384 U.S. 436 (1966).

[6]  The Supreme Court has advised that *Miranda* warnings are not required where questioning is "reasonably prompted by a concern for public safety."  *New York v. Quarles*, 467 U.S. 649, 656 (1984).  Moreover, interviews conducted for an intelligence-gathering purpose without providing *Miranda* warnings have been approved and do not undermine the validity of subsequent *Mirandized* interviews. *See, e.g., United States v. Abu Khatallah*, 275 F.Supp.3d 32, 63-64 (D.D.C. 2017); *United States v. Kweis*, 2017 WL 2385355 at *14 (E.D. Va. June 1, 2017).

other nationality.   Sylejmani also provided information about the date he arrived in Syria, that he swore allegiance to ISIS and information about his role in ISIS as a civil engineer.[7]

### B.    Interview of Defendant by the New Yorker on April 16, 2019

On April 16, 2019, Sylejmani was interviewed by journalist Robin Wright of *The New Yorker* while detained at the Dashisha prison.   According to the article ("The Dangerous Dregs of ISIS"),[8] Sylejmani was interviewed in a "makeshift office" at the prison with his hands cuffed in the back.   Robin Wright, *The Dangerous Dregs of Isis,* The New Yorker, April 16, 2019, at 4. Included in the article is a photograph of Sylejmani seated on a rug with an individual who appears to be a guard standing next to him.   *Id.*   As reported in the article, Sylejmani admitted to having joined ISIS, and claimed that he wanted to live under Sharia law.   *Id.* at 4-5.   Sylejmani further admitted to having received military training in Iraq, where he learned how to operate an AK-47 automatic rifle but claimed that he never fought.   *Id.* at 6.

### C.    Mirandized Interview of Defendant by FBI on April 21, 2019

On April 21, 2019, approximately three weeks after his initial biometric interview with the FBI, Sylejmani was again interviewed by the FBI at the Dashisha prison.   Special Agents Michael Merletti and Daniel O'Toole conducted the interview, which lasted approximately 2.5 hours.[9]

---

[7] In his motion, Sylejmani claims that on February 27, 2019, the date of his capture, he was interviewed by "unidentified U.S. personnel, including 'Mike.'" ECF #52 at 2.   The government inquired with both the FBI and the Department of Defense about whether there was any record of such an interview, and both agencies advised that there was no such record.   Furthermore, when Sylejmani was interviewed by the FBI on April 21, 2019 (as discussed further below), he was asked by agents whether he had been interviewed by DoD interrogators, and Sylejmani responded in the negative.

[8] Available at: *https://www.newyorker.com/news/dispatch/the-dangerous-dregs-of-isis*

[9] Agents Merletti and O'Toole were "walled off" from any information obtained from the defendant during his biometric interview on March 31, 2019.   The concept of "walling off" Agents Merletti and O'Toole meant that they were not privy to any information obtained from the biometric interview of the defendant.   A strict partition was maintained between the interview team that conducted the biometric interview and Agents Merletti and O'Toole.

Agents Merletti and O'Toole rearranged the interview room to provide Sylejmani with a view of the open door of the interview room, provided him bottled water, soda, snacks and a Meal Ready to Eat (MRE) during his questioning. Sylejmani was led into the room by an SDF escort, handcuffed with zip ties. The zip ties were then removed and Sylejmani remained unhandcuffed during the interview. There were no SDF guards present in the interview room or stationed immediately outside the room during the interview. The agents asked Sylejmani if he was comfortable being interviewed in English to which he responded in the affirmative. The agents asked Sylejmani how he was feeling and whether he was being fed regularly, to which he responded that he was feeling well, sleeping well, and receiving regular meals. Sylejmani ate the food that was provided by the agents during the interview, and he was also provided a jacket and blanket when he advised that he was cold. Sylejmani was permitted to take bathroom breaks during the interview. During the entire interview, agents maintained their weapons in a concealed manner so that they were never visible to Sylejmani.

During the interview, Sylejmani was asked whether he had been interviewed by any personnel from DoD, and he replied in the negative. Sylejmani did confirm having been fingerprinted by the FBI and that he had been interviewed by a reporter. Special Agents Merletti and O'Toole then explained to Sylejmani that the current interview was not a continuation of the interview he conducted with the reporter, nor was it a continuation of the FBI's fingerprint session. Agents further advised him that this interview was the beginning of a new phase of law

---

Agents Merletti and O'Toole did not refer to any information from the prior interview because they did not know what was discussed. While there may have been some overlapping content between the interviews, there was no coordination between the two interview teams. This procedure has been endorsed to ensure that questioners do not "deliberately use a two-step interrogation to thwart *Miranda*… ." *Abu Khatallah*, 275 F.Supp.3d at 63 (quoting *United States v. Straker*, 800 F.3d 570, 618 (D.C. Cir. 2015), *cert. denied*, 577 U.S. 1147 (2016).

enforcement interviews, which would also be conducted by the FBI, and that the interview was completely voluntary.   In response, Sylejmani stated that he had been fingerprinted on March 31, 2019, and that he had not been contacted again by those agents.   The agents then presented Sylejmani with the Advice of Rights for Suspects in Foreign Custody Form (depicted below). Agents asked Sylejmani if he was comfortable reading the English version of the form, and Sylejmani explained that he read English better than Arabic, and that he preferred that the agents read the form to him.   Thereafter, the agents read the form to Sylejmani in English and asked Sylejmani if he understood the form, to which he nodded his assent.   Sylejmani then signed the form, acknowledging that he understood his rights and wished to speak to agents without having an attorney present.   Agents reviewed the Advice of Rights form with Sylejmani following every break during the interview, and he never stated a desire to terminate the interview or invoke the right to have counsel present.

## ADVICE OF RIGHTS FOR SUSPECTS IN FOREIGN CUSTODY

We are representatives of the United States Government. Even though we are not in the United States, United States laws provide you with certain rights in your dealings with us. Before we ask you any questions, you must understand your rights:

LS· You have the right to remain silent. Even if you have already spoken to others, you do not have to speak to us now.

LS· Anything you say can be used against you in court.

LS· You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning.

LS If you cannot afford a lawyer, you have the right to have one appointed for you before any questioning if you wish.

LS Our ability to provide you with counsel at this time, however, may be limited by the decisions of the local authorities or the availability of an American-trained attorney.

LS· If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

## CONSENT

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Name: Lirim Sylejmani

Signature: _____

Witness Name: Daniel O'Toole, FBI Special Agent

Witness Signature: _____

Date: 21 Apr 2019 Time: 12:25 bal Place: Doshiska Prison, Syria

During the interview, Sylejmani admitted to being a member of ISIS, and advised that his Kunya was "Abu Sulayman Al-Kosovi." He further admitted that he was aware that ISIS was a terrorist organization that engaged in beheadings of American citizens. Sylejmani provided background information and a timeline from living in the United States in 2007 to his move to Kosovo in 2011. Sylejmani discussed that he and his family moved to Canada in the fall of 2011

8

and would return to the U.S. every six months for a day or two to reapply for his Canadian work permit.   Sylejmani also discussed his turn toward Islam after his father's death in 2012 and stated that he eventually found ISIS videos in 2014 regarding life in the Islamic State and saw Albanians in some of these videos.   Sylejmani described how, in 2015, he and his family moved back to Kosovo from Canada, during which time Sylejmani learned how to pray at home and he began attending a mosque.   Sylejmani also described how, in 2015, he arranged to have himself and his family smuggled into Syria through Turkey in order to join ISIS.

Sylejmani discussed his training with ISIS, admitting that the training included 21 days of Sharia and military training in Mosul, Iraq.   Sylejmani advised that military training included classroom instruction on firearms and that each ISIS recruit was issued an AK-47.   Sylejmani was trained on how to use the AK-47, including practice firing the weapon.   He also received training on other weapons, including rocket propelled grenades (RPGs).   Towards the end of military training, each recruit, including Sylejmani, was called forward to pledge bayat (oath of allegiance) to ISIS leader Abu Bakr Al-Baghdadi and ISIS.   After completion of the training, Sylejmani stated that he was issued an AK-47 rifle, AK-47 ammunition magazines and two grenades.   Sylejmani was ultimately assigned to the Tariq bin Ziyad Battalion, which was split with half of the battalion fighting in Ramadi, Iraq, and the other half stationed in Tall Kayf, Iraq. Sylejmani was initially stationed in Tall Kayf.   Sylejmani admitted that while he was in Mosul, he maintained contact with his family in Kosovo, including his sister, via a communications application called Viber.   Sylejmani stated that his family was aware that he had joined ISIS. Sylejmani discussed his various roles within ISIS before his capture, including that he was assigned to ribat (guard/sentry duty) positions on the front line during SDF's offensive in Manbij,

9

Syria.   Sylejmani claimed that in 2016 he received shrapnel wounds to his legs, which required treatment at a hospital.

During the interview, the agents informed Sylejmani that his interview with *The New Yorker* had been published and asked if he wanted to read the article.   Sylejmani asked the agents to read him the article.   Special Agent Merletti read to Sylejmani the portion of the article that contained Sylejmani's statements.   The agents asked Sylejmani if there were any sections of the article where his words or actions were not represented accurately, and Sylejmani replied that there were two inaccuracies.   Sylejmani claimed that he never told the reporter that his wife had contacts in Canada and that he never told the reporter when asked about joining ISIS, "I liked to give it a try.   It just didn't work out."   Agents asked Sylejmani if the rest of the article was accurate and whether he would accept the article as his own statement, and Sylejmani agreed. Sylejmani was asked to box off the section that was read to him (Attachment A at pp. 4-7), initial each page of the article that was read to him, and sign and date the article.   Sylejmani initialed each page, signed and dated the article and wrote "Tru Statement."

Sylejmani was also shown a video of a gathering in Manbij, Syria, in which he was recorded, and he admitted that he was depicted in the video.   Sylejmani stated that the video was of a speech by the Amir of the Abu Bakr al-Sidig Battalion from the spring of 2016.

D.     *Additional Media Interviews of Defendant Between September 2019 and February 2020*

Between approximately September 2019 and February 2020, while detained at the Dashisha prison, Sylejmani provided interviews to four additional media outlets, including CBS News, the Defense Post, National Public Radio (NPR) and ABC News.   During those interviews,

Sylejmani's statements were generally consistent with the admissions he made in *The New Yorker* article, to wit, that he was a member of ISIS.[10]

    E.    *Second Mirandized Interview of Defendant by FBI on September 15, 2020*

On September 15, 2020, Sylejmani was taken into custody by the FBI and transported via airlift back to the United States.    At the time of his transfer from SDF to U.S. custody, Sylejmani was examined by a trained FBI medic and found to be in generally good health.    This exam was documented in an FBI Record of Foreign Transfer of Custody Physical Examination.    At the time he was transferred to U.S. custody, the SDF provided U.S. officials a Memorandum of Understanding and Handing Over (Attachment B), which is signed by a U.S. government representative and the SDF General Command representative.    This Memorandum of Understanding affirms, among other things, that the detainee is in good physical condition and was not subjected to any mental or physical pressure while in SDF custody.    Sylejmani was placed in a U.S. military C-17 aircraft, and due to the COVID-19 pandemic, was seated inside a Negative Pressure Container (NPC) as a mitigation measure.    Sylejmani was provided a seat and a cot inside the NPC, along with clothing and blankets.    The NPC was equipped with a toilet.

---

[10] See James Longman, *Caliphate wives share their stories year after ISIS defeat: Reporter's Notebook*, ABC News, Feb. 19, 2020, https://abcnews.go.com/International/caliphate-wives-share-stories-year-isis-defeat-reporters/story?id=69055474; Jane Arraf, *Visiting Imprisoned ISIS Fighters*, National Public Radio, Dec. 8, 2019, https://www.npr.org/2019/12/08/786039731/ visiting-imprisoned-isis-fighter; Jared Szuba, *U.S. citizen ISIS member wants to know why he can't go home*, The Defense Post, Nov. 19, 2019, https://www.thedefensepost.com/2019/11/19/us-citizen-isis-syria-lirim-sulejmani/; Holly Williams, *ISIS suspects in overcrowded Syrian prison tell CBS News they're Americans -Inside a prison full of alleged ISIS fighters*, CBS News, September 17, 2019; https://www.cbsnews.com/news/isis-suspects-in-overcrowded-syria-prison-tell-cbs-news-theyre-american-sdf-says-needs-help-2019-09-17/.

Sylejmani was provided with food, water, and an N-95 mask.   Additionally, a Quran was made available to him, and he was provided opportunities to pray.

The C-17 aircraft departed Syria at approximately 5:48 a.m., at which time earmuffs and eye coverings were removed from Sylejmani, but he remained in handcuffs and leg-shackles.   At 10:09 a.m., after a refueling stop in Kuwait, and after the C-17 had taken off from Kuwait en route to Spain for a second refueling stop, Special Agents David Robins and Marshall Vaeth initiated an interview with Sylejmani.   The NPC was divided into two halves by a curtain because an additional prisoner was being transported along with Sylejmani.   At the time of the interview, the handcuffs were removed from one of Sylejmani's hands; his ankle restraints remained in place. Neither Special Agent Robins nor Vaeth were armed during the interview.   Sylejmani was provided with food and water on the seat next to him during the interview and he was offered multiple restroom breaks during the interview.   Sylejmani consumed multiple snack bars and a Halal MRE.

At the start of the interview, agents asked Sylejmani how he was feeling and if he felt comfortable inside the NPC, and he responded that he was doing fine.   Agents then informed Sylejmani that he was en route to the United States, that he had been indicted on charges brought in the United States District Court in Washington, D.C., and that he would be provided an attorney and brought before a judge upon landing.   Sylejmani acknowledged that he understood his legal situation and then asked about the status of his family in Kosovo.   Special Agent Robins informed Sylejmani that recent contact had been made with his family, and that they were thankful for his safety and U.S. efforts to return him from Syria.   Agents identified themselves to Sylejmani, explained that this was a law enforcement interview and that it was completely voluntary.

Sylejmani indicated that he understood.    The agents presented Sylejmani with an English version FD-395 "Advice of Rights" form (inserted below).    At Sylejmani's request, Special Agent Robins read the form to him.    While Special Agent Robins read the form, Sylejmani nodded in agreement, and when Special Agent Robins finished reading the form and asked Sylejmani if he understood the rights on the form, Sylejmani nodded his assent.    Sylejmani signed the form at approximately 10:45 a.m. and agreed to speak to agents without having an attorney present. Sylejmani also signed a "Waiver of Right to Speedy Presentment" (inserted below). Sylejmani asked about the status of his wife and whether she was alive, to which Special Agent Robins responded that the FBI was actively working to confirm her status.

| FD-395<br>Revised<br>11-05-2002 | FEDERAL BUREAU OF INVESTIGATION<br>**ADVICE OF RIGHTS** | | |

## LOCATION

Place: U.S. Airforce Flight from Syria to Dulles, VA    Date: 09/15/2020    Time: 1045

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

## CONSENT

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed: _____

## WITNESS

Witness: _____    DAVID RODINS

Witness: _____    MARSHALL VAETH

Time: 4045

14

**WAIVER OF RIGHT TO SPEEDY PRESENTMENT**

You have a right to be taken without unnecessary delay before a U.S. court, where a judge will advise you of the charges against you and of your rights. Among those rights are your right to hire an attorney of your choice, or, if you cannot afford to hire your own attorney, your right to request that the court appoint an attorney to represent you. The judge also will determine whether you will be detained or allowed pretrial release. If you waive your right to be brought to court at this time, you still will be presented to the judge so that you can be informed of and exercise your rights, but providing a statement at this time may cause your initial appearance in court to be delayed.

Do you understand the right to be brought to court without unnecessary delay?

YES _L. S._          NO _____

Are you willing to waive the right to be brought to court without unnecessary delay?

YES _L. S._          NO _____

Signature of Defendant: _[signature]_

Name of Defendant: _Lirim Sylejmani_

Date & Time: _09/15/2020 @ 1045_

Signature of Witness: _[signature]_

Name of Witness: _DAVID ROBINS_

Date & Time: _09/15/2020 @ 1045_

_[signature]_

_MARSHALL F. VAETH_

_09/15/2020 @ 1045_

The agents then asked Sylejmani about his statements to multiple media outlets, including ABC News, CBS News, the Defense Post and NPR. For each report, the agents played for Sylejmani a video or audio of the interview or read him the article. In each instance, Sylejmani

15

acknowledged that he recalled providing the interview.    Agents also asked whether there were any inaccuracies in any of the statements or articles he reviewed.    Sylejmani noted a few minor corrections or clarifications, but at no time did he retract his admissions that he had joined ISIS or that he had received military training.    The interview with Sylejmani concluded at approximately 11:38 a.m.    Sylejmani then requested medication for a headache and antibiotic medication for an infected laceration on his hand.

### E.       Statement of Former SDF Detainee AAM

It should be noted that another former ISIS member identified as AAM was detained at the Dashisha prison in mid-2019 where he met the defendant. According to interviews with the FBI following his return to the United States to face U.S. charges, AAM described the prison conditions as extremely poor and stated that the SDF guards would physically beat and abuse prisoners if they denied being affiliated with ISIS. AAM described one occasion when he, the defendant and another prisoner were locked in an isolation room with freezing temperatures. In all AAM's conversations with Sylejmani, the defendant never made any claims of being abused or coerced to make statements to the media or law enforcement.    AAM personally reported that he was beaten before an FBI interview by the SDF, and that after the interview he was beaten and placed in isolation. He also reported that the FBI told him during one interview that he would be permitted to make a phone call to his family, but when he later asked SDF for permission to make the call, he was beaten and placed in isolation.    AAM admittedly lied to the FBI during two interviews, following beatings by SDF before and after the second interview. AAM never underwent mistreatment at the hands of the FBI.

The defendant filed his motion to suppress (ECF #52) on March 15, 2024, seeking suppression of all statements he made to the FBI and media outlets. The defendant asserts the following in support of his motion: (1) his statements to the FBI and the media while in SDF custody were involuntary and the product of coercion as a result of poor living conditions and physical abuse he received at the hands of SDF prison guards; (2) the February 27, 2019 and March 31, 2019 statements to U.S. officials should be suppressed because they were taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); and (3) the FBI interview conducted on September 15, 2020, should be suppressed as "fruit of the poisonous tree" because that interview concerned the allegedly involuntary interviews Sylejmani provided to the media. ECF #52 at 2. The defendant's motion is without merit and should be denied. As discussed below, there is insufficient credible evidence that conditions at the SDF prison facilities at which he was detained, or alleged abuse committed by SDF, a non-state actor, had any impact on Sylejmani's decision to waive his rights and speak to the FBI, on April 21, 2019, and September 15, 2020, his decision to speak to the media, or on the reliability of the statements he ultimately made. Moreover, the defendant is asking this Court to suppress statements to media outlets, without citing any precedent. The government is not aware of and found no case in which a court has ever suppressed a media interview under these circumstances. There can be no suppression here where there is no state action and no implicit or explicit coercion by Western media outlets or the FBI.

## II.    **ARGUMENT**

A statement is voluntary for the purpose of due process so long as the statements are "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*,

412 U.S. 218, 225-26 (1973) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Moreover, for a statement to be involuntary, it must have been caused by government overreach. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986) ("[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law").    There is no indication of such overreach in this case. Moreover, even if there were, there is no indication in this case that under the totality of the circumstances, *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (government has burden of establishing under preponderance of the circumstances that the confession was voluntary), that the defendant's will was overborne.    *See Rogers v. Richmond*, 365 U.S. 534, 544 (1961) (government conduct must be "such as to overbear [a suspect's] will to resist and bring about confessions not freely self-determined").

In order to determine whether a statement was voluntarily made, the court must examine the totality of circumstances to determine whether an individual's "will has been overborne and his capacity for self-determination critically impaired."    *Schneckloth v. Bustamonte*, 412 U.S. at 225.    *Accord United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988) (defendant's seasickness, his uncomfortably hot room, and his unfamiliarity with American legal culture not a legally adequate basis for concluding that confession was involuntary); *see also Harris v. Dugger*, 874 F.2d 756, 759-62 (11th Cir. 1989) (confession voluntary even though defendant in forearm cast and handcuffed during six-hour interrogation); *United States v. Leon Guerrero*, 847 F.2d 1363 (9th Cir. 1988) (promises that cooperation would be communicated to prosecutors insufficient to overcome will); *United States v. Pelton*, 835 F.2d 1067 (4th Cir. 1987) (FBI agent's assertion that he would launch full-scale investigation if defendant did not cooperate not sufficient to render

statements involuntary).   Testimony and evidence at a pre-trial hearing in this case will demonstrate that the statements made by the defendant were voluntary.

> A.   *Even assuming coercive conditions at SDF Prisons, there was no government action that would trigger suppression.*

As an initial matter, even assuming that the poor conditions at the Dashisha prison facility and alleged physical abuse by SDF guards existed, there was no state action that would warrant suppression of the defendant's statements on that basis.   In *U.S. v. Elsheikh,* 578 F.Supp.3d 752, 775 (E.D. Va. 2022), a case involving strikingly similar allegations of abuse by an ISIS member detained in a different SDF facility, the Court stated that, "it is far from clear that the alleged treatment by the SDF meets the threshold requirement of state action, which the Supreme Court set forth in *Connelly* as a predicate for exclusion of a purportedly involuntary confession."   The Court observed that Elsheikh cited no cases in which torture or coercive treatment by actors not affiliated with any state supported exclusion of a confession, noting that "any such decisions would clearly conflict with the Supreme Court's instruction that '[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause."   *Id.*

Like Sylejmani, Elsheikh*,* a United Kingdom citizen, traveled through Turkey to Syria to join ISIS.   Like Sylejmani, Elsheikh was eventually captured by SDF and held in an SDF prison. Elsheikh, like Sylejmani, was interviewed by journalists while in SDF custody and thereafter alleged coercion in an attempt to suppress his statements made both to the FBI and to journalists. The Court in *Elsheikh* further stated that the SDF is an "ad hoc Kurdish military force" which "is not a component of the Syrian regime or any other formal state."   *Id.* at n.26.   The Court further noted that the record contained not a "scintilla of evidence that the SDF committed torture at the

19

behest of or in concert with the United States or any other recognized state." *Id.*   Thus, consistent with the Supreme Court's decision in *Connelly*, and as noted in *Elsheikh*, there is simply no state action committed that would support suppression of the defendant's statement based on allegations of SDF coercion.

Elsheikh made statements to the media, as the defendant has done.   The Court noted that Elsheikh's statements to media outlets involved "purely private individuals, namely journalists not affiliated with any government."   *Elsheikh,* 578 F.Supp.3d at 775, n.26. The *Elsheikh* court observed, "[p]ut simply, it is difficult to see how Defendant alleges anything more than 'outrageous behavior by . . . private parties,' which is insufficient to support constitutionally-required exclusion."   *Id.*   This court should conclude likewise.

The decision in *United States v. Karake, et al.,* 443 F.Supp.2d 8 (D.D.C. 2006), relied upon by the defense, is inapposite.   In *Karake*, the government sought to admit statements made by the defendants while in the custody of the Rwandan government that were made to both Rwandan government officials and U.S. officials conducting a joint investigation into the abduction and murder of U.S. citizens in Rwanda.   Rwandan officials conducted their own interrogations of the defendants in that case, without providing *Miranda* warnings, statements which the Court determined were the product of acts of coercion, including torture, warranting suppression.   *See Karake*, 443 F.Supp.2d at 83-84.   In *Karake*, U.S. law enforcement interrogated the defendants, often times in the presence of Rwandan officials who also participated in the interrogation, both as translators and as interrogators.   *Id.* at 26.   The Court noted that the Rwandan officials "also assisted the FBI in administering the advice of rights…to each suspect prior to the investigation."   *Id.*

The court in *Karake* held that the statements the defendants made to U.S. law enforcement were subject to suppression on two grounds: (1) the confessions made to U.S. authorities were not sufficiently attenuated from the coerced confessions made to the Rwandans (*Id.* at 87-89); and (2) the defendants' waiver of *Miranda* rights was not voluntary, knowing and intelligent.   *Id.* at 90-94.   Concerning the lack of attenuation, the court in *Karake* held that the confessions made to U.S. authorities were not sufficiently attenuated from the coerced confessions made to the Rwandans due to the "extensive involvement of Rwandan officials throughout the many months of interrogations." *Id.* at 87.   The court emphasized that the Rwandans "conducted interrogations of the [defendants]… out of the presence of the Americans" at times when U.S. officials were also conducting interrogations. *Id.*   Regarding the *Miranda* waivers, the court held, due to the coercive conduct of the Rwandans and the continued detention of the defendants by the Rwandans during the course of the interrogations by U.S. officials, "[t]he evidence indicates that the defendants were in no position to refuse to speak with the American investigators, regardless of any arguable comprehension of their Fifth Amendment rights." *Id.* at 90.   As to absence of evidence establishing a knowing ad intelligent waiver, the court noted multiple factors, including: the individual defendants' lack of comprehension of their Fifth Amendment rights, including the limited education of the defendants; lack of information regarding whether the advice of rights were properly translated and whether the defendants were able to read the advice of rights form; lack of evidence that warnings were even given in some instances; and the absence of signed written waivers for some of the statements. *Id.* at 90-93.

Unlike in *Karake,* in the instant case, there was no joint US-SDF investigation of the defendant.   The FBI interrogators never received information from the SDF about any statements

21

made by the defendant to the SDF.   Further, no SDF officials were present while the defendant was being interviewed, and therefore, the SDF would have no information about what specifically the defendant said or did not say to the FBI.   Nor did the FBI provide any such information to the SDF following any FBI interview of the defendant.   Accordingly, there is simply no evidence of government action which would warrant suppression for alleged coercion.   *See Connelly,* 479 U.S. at 163-64; *Elsheikh*, 578 F.Supp.3d 752, 775, n.26.

> B.    *There is insufficient evidence of any mistreatment of the defendant which impacted his statements to the media or the FBI.*

Regardless of the general conditions at Dashisha Prison or other SDF facilities, the defendant's claims of torture and mistreatment are also dubious.[11]   For example, Sylejmani claims in his motion that on his way to speak to the FBI on March 31, 2019 (biometric interview), he was "so weak and enervated by this time that he could not climb the stairs to the second floor where the FBI agents were waiting.   He had to be lifted and carried up the stairs."   ECF #52 at 6.   He also claimed that less than two weeks before this interview, SDF guards had punched him in the face, hit him with rubber hoses and whipped him with electrical wires.   *Id*. at 5.   The government anticipates that the testimony from one or more FBI personnel who were present during that biometric interview will indicate that the agents did not observe any injuries on the defendant, nor did he appear to be moving in a manner that would indicate that he was suffering from injuries one would expect to exist after having been hit with a rubber hose, whipped with electrical wires, or otherwise "so weak" that he appeared unable to walk.

---

[11] As the Court in *Elsheikh* noted, the defendant "possesses a strong motive to fabricate or exaggerate mistreatment by the SDF."   578 F. Supp. 3d at 776, n.28.

While it appears that SDF officials were present during some or all of the media interviews with the defendant, the videos and photos of the defendant taken during these interviews also do not show any obvious signs of abuse.[12]    Further, the defendant's demeanor in these interviews appears both relaxed and voluntary.   The defendant claims that SDF guards "would make him stand naked in front of everyone as they insulted him and beat him and questioned him about what he did for ISIS.   When he refused to tell them what they wanted to hear—that he fought and killed for ISIS—they sent him away for special interrogation."   ECF #52 at 4.   The defendant further claims that given the abuse he had suffered at the hands of the SDF, the evening before his April 16th interview with *The New Yorker*, "he determined that he would say anything to anyone to avoid being buried without a name in an unmarked grave."   *Id.* at 7.   The defendant further claims that he agreed to be interviewed by the media in order to bring attention to his predicament, thereby becoming "well enough known that the SDF could not just summarily kill him…" and that "[h]e would answer every media question in as broad, interesting, and provocative a manner as possible, so that he would be quoted in the articles…"   *Id.*

However, rather than provide "broad, interesting, and provocative" answers, such as describing battles he may have participated in, ISIS atrocities he may have heard about or witnessed, or knowing high profile ISIS members, defendant's statements to the media were minimal, confined to admitting to having joined ISIS and having received military training. Contrary to providing statements to the media which would bring attention to his dire situation and placate his alleged abusers, defendant merely asserted that he "wanted to live under Sharia law"

---

[12] As discussed *infra,* these media outlets consisted of "purely private individuals, namely journalists not affiliated with any government," and therefore any coercive conduct was "insufficient to support constitutionally-required exclusion."   *Elsheikh*, 578 F.Supp.3d 752, 775, n.26.

and that he "fired about twenty bullets when I was doing training…That's as much fighting as I did." *See Dangerous Dregs of ISIS,* The New Yorker, at 6.   These do not appear to be the statements of an individual convinced that the SDF would bury him "in an unmarked grave" if he failed to admit that he "fought and killed for ISIS."   ECF #52 at 4, 7.

The defendant's statements to the media minimizing his actions on behalf of ISIS are entirely consistent with what he told the FBI during his *Mirandized* interviews, including statements he made while he was still in SDF custody and presumably still arguably subject to potential abuse for failing to tell the FBI what the SDF allegedly told him to say.   There is every indication that, notwithstanding the defendant's assertions of coercion, his statements to both the FBI and the media are reliable.   *See Jackson v. Denno,* 378 U.S. 368, 385-86 (1964) (noting the "probable unreliability" of confessions obtained through coercion).   Indeed, as described in detail *supra*, the defendant made similar admissions of having joined ISIS and having received "training" in text messages with his sister (inserted below), well before his detention in SDF facilities.[13]

---

[13] The aforementioned text messages were obtained pursuant to a formal request to Kosovo pursuant to a Mutual Legal Assistance Treaty (MLAT).  These messages were obtained from the cellular telephone of the defendant's sister.



]



25

In other parts of this text message conversation, the defendant's sister referred to him by his first name, Lirim. Defendant's admissions in the above-referenced text messages were made in 2016, while he was still a member of ISIS and at a time when there could be no claim that he was under duress. These text messages provide significant corroboration of the reliability of the defendant's admissions to both the media and the FBI while he was in SDF custody.

C.      *Defendant's waiver of his rights was voluntary, knowing and intelligent.*

*Miranda* requires that custodial interrogation be preceded by advice to the defendant informing him of his right to remain silent and his right to have counsel present. *Id*. at 479. The *Miranda* protection is only concerned with the statements made during a custodial interrogation and an officer need not give *Miranda* warnings unless the defendant is in custody. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Interrogation, as defined by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291 (1980), includes either "express questioning or its functional equivalent." A waiver of *Miranda* rights is knowing and valid when "made with a full awareness both of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987). That is, the suspect must understand the nature of the *Miranda* rights and the general consequences of making a statement -- *i.e.*, that it can be used to incriminate the suspect. *See also United States v. Bradshaw*, 935 F.2d 295 (D.C. Cir. 1991) (valid waiver determined by voluntariness of decision to waive and by whether the decision to waive was made with "full awareness" of "nature" of waived rights, and consequences of waiver) (citations omitted). The government must establish a valid waiver by a preponderance of the evidence. *Miranda*, 384 U.S. at 443.

26

In this case, the defendant was in SDF custody at the time the FBI questioned him on March 31, 2019, April 21, 2019, and in FBI custody on September 15, 2020.   As mentioned *supra*, the government does not seek to use in its case-in-chief any statements made by the defendant during his March 31, 2019 interview with the FBI.   As to the statements made during the April 21, 2019 and September 15, 2020 interviews, the evidence at a hearing on the motion will establish that, before making any statements during these interviews, defendant was properly advised of his *Miranda* rights, and under the totality of the circumstances, he waived his rights knowingly and voluntarily.   At the time the defendant executed the written waivers of his rights, he was 45 years old, was a naturalized U.S. citizen who had previously lived in the United States for an extended period of time, was admittedly comfortable communicating in English, and had maintained gainful employment while living in the United States.   There is also no assertion that the defendant suffered from any cognitive dysfunction or lack of education that would have rendered him incapable of exercising a knowing waiver of his rights. Moreover, where, as here, he explicitly waived those rights, defendant is hard-pressed to prevail in this claim.   *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (express waiver is strong proof of validity of the waiver); *United States v. Yunis*, 859 F.2d 953, 961-962 (D.C. Cir. 1988) ("[t]he administration of proper *Miranda* warnings, followed by a written waiver of the rights ... will usually go far toward demonstrating that a decision to speak is not compelled") (citations omitted).   Although the defendant had been exposed to an un-*Mirandized* biometric enrollment interview approximately three weeks prior to his first *Mirandized* interview with the FBI on April 21, 2019, the evidence presented at an evidentiary hearing will establish that there was no intent to conduct a "two-step interrogation technique" to purposefully "undermine the *Miranda* warning."   *See Abu Khatallah,* 275 F.

.Supp.3d at 62-66; *Elsheikh*, 578 F.Supp.3d at 772 (quoting *Missouri v. Seibert*, 542 U.S. 600, 622 (2004) (holding that "if law enforcement interviewers did not deliberately seek to undermine *Miranda*, the analysis 'should continue to be governed by the [voluntariness] principles of *Elstad*'"); *see also Oregon v. Elstad*, 470 U.S. 298, 309 (1985) (holding that incriminating statements offered after mid-interview *Miranda* warnings are admissible provided that the defendant "knowingly and voluntarily" waived his rights and elected to speak to interviewers). In this regard, the circumstances surrounding the biometric interview and the later *Mirandized* interviews of the defendant are virtually identical to what occurred in *Elsheikh*, where the court found no deliberate attempt by the FBI to conduct a two-step interrogation technique to undermine the *Miranda* warning.    *Elsheikh*, 578 F.Supp.3d at 772.    The court in *Elsheikh* noted the different purposes behind the conduct of the un-*Mirandized* biometric interview and the two subsequent *Mirandized* interviews, the former focusing on intelligence gathering to assess ISIS threats and capabilities, and the latter to "develop evidence for a potential criminal prosecution."    *Id.* at 773. Accordingly, this Court need only determine whether the defendant knowingly and voluntarily waived his rights during the April 21, 2019 and September 15, 2020 interviews.    As discussed above, the circumstances of these interviews establish his waivers were both knowing and voluntary.

Even assuming the Court determined that the FBI employed such a two-step strategy to undermine the *Miranda* warnings given to the defendant, the evidence will establish that the defendant understood the "import and effect" of the warnings given during the two interviews. *Seibert,* 542 U.S. at 622.    Twenty-one days passed between the un-*Mirandized* biometric interview and the first *Mirandized* interview on April 21, 2019.    *Id.*; *See also Abu Khatallah,* (two

day break between interviews found to be "significant"); *Eslsheikh,* 578 F. Supp.3d at 774 (20 days FBI between DoD and FBI interviews, "a time period substantially longer than any gap between any of the DoD interviews and twice as long as the period that the Fourth Circuit in *Kweis* viewed as a sufficient curative measure."); *Elstad,* 470 U.S. at 300-01 (a one-hour break in contact between the unadvised and advised statements).     Another 17 months passed until the next *Mirandized* interview with the defendant on September 15, 2020, which occurred after the defendant was out of SDF custody and was on a transport plane to the United States.     Not only was there a significant period of time between these interviews, but the evidence will also establish that the agents who conducted the two *Mirandized* interviews were insulated from the information the defendant provided during the biometric interview, such that they could not exploit anything the defendant had previously told the FBI interviewers in that interview to elicit incriminating statements in the later, *Mirandized* interviews.     *Elsheikh,* 578 F.Supp.3d at 774 ( FBI agents made clear to defendant that any prior statements made to DoD were unknown to the interviewing agents and did not require him to speak to the agents; "True to their word, the Agents had previously taken careful steps to avoid any knowledge of the intelligence interviews, and they did not confront Defendant with any prior statements to the DoD interviewers.").     Accordingly, there were multiple curative steps taken by the agents that would have enabled the defendant to understand the "import and effect" of the warnings.

As in *Elsheikh,* during the April 21, 2019 interview, the agents explained to Sylejmani that this interview was not a continuation of the interview he conducted with the reporter (on April 16th), nor was it a continuation of the FBI's fingerprint session.     Agents further advised him that this interview was the beginning of a new phase of law enforcement interviews, which would also

be conducted by the FBI, and which were completely voluntary.  *See generally Abu Khatallah,* 275 F. Supp.3d at 65; *Elsheikh,* 578 F.Supp.3d at 774.   Similarly, during the September 15, 2020 interview, the agents explained to the defendant that he had been indicted and would be presented to a judge and provided an attorney upon arriving in the United States.   The agents further explained that this was a law enforcement interview and that it was completely voluntary. Accordingly, this Court should find that the defendant's waiver of his rights during both *Mirandized* interviews was voluntary and knowing.

> D.      *Transport interview of Defendant on September 15, 2020 was sufficiently attenuated from any alleged coercive circumstances of confinement by SDF.*

Should this Court determine that the defendant was subject to acts of coercion that affected his decision to waive his rights and speak to the FBI on April 21, 2019, or to speak to the media, there was sufficient attenuation between any alleged coercion by the SDF and the defendant's statement to the FBI on September 15, 2020, after he left Syria, to render that statement admissible. Even in cases "'in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court has held that the coercive effect of the confession could, with time, be dissipated.'"   *Karake,* 442 F.Supp.2d at 86 (quoting *Elstad*, 470 U.S. at 311-312). Indeed, "the admissibility of the later confession depends on the same test—is it voluntary." *Lyons v. Oklahoma,* 322 U.S. 596, 603 (1944).

In assessing whether a confession obtained after the procurement of a statement through coercion is voluntary, the Supreme Court has identified multiple factors, including: (1) "the time that passes between confessions; (2) the change in place of interrogation; and (3) the change in identity of the interrogators."   *Elstad*, 470 U.S. at 310.   Courts may also consider "the continuing effect of the prior coercive techniques on the voluntariness of any subsequent

confession."    *Karake*, 443 F.Supp.2d at 87 (citing *Lyons*, 322 U.S. at 603).    Thus, courts look to determine whether there exists a "break in the stream of events—sufficient to insulate the statement from the effect of all that went before."    *Clewis v. State of Texas,* 386 U.S. 707, 710 (1967).

As discussed *supra*, and as will be established at an evidentiary hearing, the September 15, 2020 *Mirandized* interview occurred 17 months after the previous interview of the defendant by the FBI, and approximately seven months after the last media interview provided by the defendant. Accordingly, there was a clear "break in the stream of events" that could have allegedly led to the defendant's prior statements.    Furthermore, the defendant's removal from SDF custody, his placement on a U.S. transport plane, the delay of questioning until he had already left Syrian airspace and the fact that he was told that he was on his way to appear in court in the United States, where he would appear before a judge and have an attorney appointed for him if he could not afford one, clearly attenuate this *Mirandized* statement from any claimed coercive circumstances which the defendant alleged existed while he was in SDF custody.    Moreover, the identities of the agents conducting the September 15 interrogation were different from the agents for either of the two prior interviews by the FBI.    Thus, under the *Elstad* factors, the September 15, 2020 *Mirandized* interview was clearly voluntary.    The instant situation is also in stark contrast to that of *Karake,* where the court noted that the defendants' statements to U.S. officials were not sufficiently attenuated from the acts of mistreatment they were subjected to by Rwandan officials where the Rwandans were also extensively involved in the interrogations, including those involving the Americans, and where the defendants remained in Rwandan custody at all times and returned to the location where they were tortured after the conclusion of the interrogation by the Americans.    *Karake*, 443 F.Supp.2d at 89.    Comparing the circumstances to those presented in

*Karake,* the defendant's waiver of his *Miranda* rights on September 15, 2020, was sufficiently attenuated from any alleged prior coercion he claims to have endured, and therefore, his statements to the FBI should be deemed voluntary.   *Id.* at 89.

WHEREFORE, the government respectfully requests that the Court deny the defendant's motion to suppress.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. BAR NO. 481052

By:

                                /s/     *Steven B. Wasserman*
Steven B. Wasserman
D.C. Bar No. 453251
Brenda J. Johnson
D.C. Bar No. 370737
Assistant United States Attorneys
 601 D Street, N.W.
Washington, D.C. 20530
(202) 272-7719-Wasserman
(202) 252-7801 -Johnson
Steve.Wasserman@usdoj.gov
Brenda.Johnson@usdoj.gov

Jennifer E. Levy
D.C. Bar 291070
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
Jennifer.E.Levy@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served upon Ubong Akpan and Sabrina Shroff, counsel for defendant via the electronic case filing system, this 31st day of May 2024.

/s/
STEVEN B. WASSERMAN
Assistant United States Attorney