UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,

v.

Lirim Sylejmani,

Defendant.

Case No. 20-cr-106 (RC)

**LIRIM SYLEJMANI'S REPLY IN FURTHER SUPPORT
OF HIS MOTION TO SUPPRESS STATEMENTS**

Mr. Lirim Sylejmani has moved to suppress ten – now eight[1] – FBI and media interviews because each of them was involuntary. These interviews were all done while Mr. Sylejmani was sleep deprived, starving, weak from weight loss, and gravely ill. *See* Sylejmani Motion to Suppress [ECF Doc. No. 52] ("Sylejmani Motion") at 2-10. They took place after he had spent several weeks being deliberately subjected to exposure, harsh conditions, humiliation, beatings, psychological and physical torture, and repeatedly told that he and his family would be killed if he did not cooperate by saying whatever needed to be said. *Id.* Given all this, the law requires that the interviews be suppressed as involuntary. *Id.* at 10-13.

Having met his initial burden of proving the subject interviews should be suppressed, the burden then shifted to the government to prove, by a preponderance of the evidence, that the challenged interviews are admissible. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). This, the government has failed to do.

---

[1] The ten interviews originally at issue were: (i) 2/27/19 interview by U.S. personnel; (ii) 3/31/19 FBI interview; (iii) 4/16/19 media interview; (iv) 4/21/19 FBI interview; (v) 9/17/19 media interview; (vi) 9/18/19 media interview; (vii) 11/19/19 media interview; (viii) 12/8/19 media interview; (ix) 2/19/20 media interview; (x) 9/15/20 FBI interview. The government now agrees it will not introduce statements from the first two interviews at trial. *See* Government's Opposition to Defendant's Motion to Suppress Statements [ECF Doc. No. 55] at 4-5; Argument, Point I, below.

The government's opposition declines to grasp the nettle and acknowledge the effect these many weeks of extreme pressure, threats, and abuse had on the (in)voluntary nature of Mr. Sylejmani's interview statements. Instead, the government shuts its eyes, ignoring or baldly denying the abuse Mr. Sylejmani suffered while in SDF custody, so the government can pretend the statements he made were voluntary. The Court, however, may not shut its eyes. Taking the facts of Mr. Sylejmani's suffering into account, the Court should suppress Mr. Sylejmani's statements under basic principles of due process. Indeed, while the government asked for, and received, a lengthy extension of time "to locate and interview overseas witnesses to reply to the motion" (Govt. Unopposed Motion for Extension of Time, ECF Doc. No. 53), the government has found no witnesses contradicting Mr. Sylejmani's account. To the contrary, the only witness found has *corroborated* Mr. Sylejmani's account of SDF torture, coercion, and abuse. *See* Government's Opposition to Defendant's Motion to Suppress Statements [ECF Doc. No. 55] ("Govt. Opp. Br.") at 16 (Statement of Former SDF Detainee AAM).

For these reasons, and those set forth in his moving papers, the Court should suppress every one of Mr. Sylejmani's statements. At the least, the Court should hold an evidentiary hearing before making this important, fact-intensive decision.

## <u>ARGUMENT</u>
### <u>THE COURT SHOULD SUPRESS ALL TEN INTERVIEWS AT ISSUE</u>

### I. THE GOVERNMENT CONCEDES IN ITS OPPOSITION THAT THE FIRST TWO INTERVIEWS ARE INADMISSIBLE

The government now agrees it will not use the 2/27/29 interview by U.S. personnel and the 3/31/19 FBI interview as part of its case-in-chief. *See* Govt. Opp. Br. at 4-5. In this regard, the government states that it has no record of what was said at the first 2/27/19 interview (*id.* at 5 n.7) and that the "agents [at the second 3/31/19 FBI interview] did not advise the defendant of his

*Miranda* warnings at any point during the interaction" (*id.* at 4), rendering the interview inadmissible. *See, e.g., Miranda v. Arizona,* 384 U.S. 436 (1966); *United States v. Giddins*, 858 F. 3d 870, 879 (4th Cir. 2017) (statements made during custodial interrogation "will be suppressed" unless the defendant is advised of his rights under *Miranda* and "knowingly, intelligently, and voluntary waives those rights"); Sylejmani Motion at 13-14.

Despite stating that it will not use the first or second interviews at trial, the government still half-heartedly contends, in footnote 6 to its opposition, that it could admit these interviews into evidence if it chose. The government is wrong.

The government efforts to shoehorn the second interview into the narrow "public safety" exception to the *Miranda* requirement (Govt. Opp. Br. at 4 n. 6) are unsuccessful. The government does not, and cannot, identify any "exigency" involving "a matter of seconds" creating "a threat to the public safety [that] outweighs the need for the prophylactic [*Miranda*] rule." *New York v. Quarles*, 467 U.S. 649, 657-658 (1984) (recognizing "public safety" exception in case where *Miranda* warnings were delayed just long enough for police officers to ask the questions needed to find a loaded revolver hidden somewhere in a supermarket).

Equally untenable is the government's novel contention that the second interview may be admissible because "interviews conducted for an intelligence-gathering purpose" need not be Mirandized. Govt. Opp. Br. at 4 n. 6. This sweeping assertion is incorrect and not supported by the two cases the government cites. These two cases – *Khatalla* and *Khweis* – do not create a general "intelligence gathering" exception to *Miranda*. Rather, both cases concerned the use of a "two-step" interrogation process with terror suspects, where officers initially question a suspect without providing a *Miranda* warning, and then provide a *Miranda* warning "midstream" before starting another round of questioning. Both cases hold that, depending on the circumstances, the

second round of questioning may be admissible, but that the pre-*Miranda* statements are inadmissible. *See United States v. Khatalla*, 275 F. Supp. 3d 32, 63-64 (D.D.C. 2017) ("The question thus becomes whether the midstream *Miranda* warning can overcome the coercive nature of the initial, unwarned interrogation, rendering the second set of statements admissible at trial."); *United States v. Khweis*, 971 F.3d 453, 459 (4th Cir. 2020) ("Midstream warnings obviously cannot render prewarning statements admissible."); *see also Missouri v. Seibert*, 542 U.S. 600, 621-622 (2004) (Kennedy, J., concurring in the judgment) (explaining when midstream *Miranda* warnings render post-warning statements admissible). Here, of course, no *Miranda* warnings were given at any point in the 3/31/19 FBI interview, so nothing in that interview is admissible.

## II.    INTERVIEWS THREE THROUGH NINE ALSO REMAIN INADMISSIBLE

The FBI and media interviews of Mr. Sylejmani conducted while he was in Syrian prisons – interviews two through nine – were procured during weeks of unceasing beatings, torture, and threats. *See* Sylejmani Motion at 2-10. Plainly, the contents of these interviews were not voluntary, but coerced, and therefore must be suppressed. The contentions raised by the government in its opposition do not change this result.

The government wastes much ink contending that Mr. Sylejmani's coerced statements are true, pointing, for example, to certain text messages between him and his sister that purportedly corroborate the statements at issue. *See* Govt. Opp. Br. at 25. Those text messages, however, are merely carefully chosen snippets of larger conversations. They are incomplete, shorn of context, and prove nothing.[2] More fundamentally, statements such as these, that are procured by coercion,

---

[2] For example, the government points to a statement from Mr. Sylejmani that he is "training." Govt. Opp. Br. at 24-26. The government's snippet, however, does not include Mr. Sylejman's response to his sister's understandable question: "What training?" *Id.* at 25. This failure to provide a complete transcript of the conversation makes the type of "training" referenced – whether military training as the government contends, or some other type of training, such as language or religious training – a matter of material dispute.

must be suppressed as a prophylactic measure not only because they are *per se* involuntary and untrustworthy, but because admitting such coerced statements is offensive to basic standards of justice. *See, e.g., Brown v. Mississippi*, 297 U.S. 278, 286 (1936). *United States v. Karake*, 443 F. Supp. 2d 8, 51 (D.D.C. 2006); *Mohammed v. Obama*, 704 F. Supp. 2d 1, 24–25 (D.D.C. 2009); *Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944); *Rogers v. Richmond,* 365 U.S. 534, 541 (1961); *Jackson v. Denno*, 378 U.S. 368, 386 (1964). Thus, true or false, a coerced statement must be suppressed. *Culombe v. Connecticut*, 367 U.S. 568, 582 (1961) (stating that it is a "fundamental concept" of our constitutional system of criminal law that "neither the body nor the mind of an accused may be twisted until he breaks").

Moreover, it is the government that bears the burden of showing, by a preponderance of the evidence, that the challenged statements were voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997); *Karake*, 443 F. Supp. 2d at 49–52. Here, the government attempts to meet its burden in two ways: (i) by ignoring or minimizing what happened to Mr. Sylejmani; and (ii) by pretending that, so long as the FBI itself did not directly harm or threaten Mr. Sylejmani, the statements should be admitted. The government's efforts fail.

In determining whether a statement is coerced or voluntary, the Court must ask whether "the confession is the product of an essentially free and unconstrained choice by its maker," or whether "his will has been overborne and his capacity for self-determination critically impaired." *Culombe*, 367 U.S. at 602. In turn, the answer to this question requires a factual inquiry; it is determined by considering "the totality of all of the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *accord al-Qurashi v. Obama*, 733 F. Supp. 2d 69, 79

(D.D.C. 2010); *Esmail v. Obama*, 709 F. Supp. 2d 25, 28 n.3 (D.D.C. 2010); *Al Madhwani v. Obama*, 696 F. Supp. 2d 1, 7 (D.D.C. 2010).

Here, the "totality of all the surrounding circumstances" necessarily includes what the government improperly tries to ignore – Mr. Sylejmani's systematic torture and mistreatment, the entire purpose of which was to break Mr. Sylejmani physically and mentally and ensure that his goal was not to tell the truth to his American questioners, but to say whatever they wanted him to say. *See* Sylejmani Motion at 2-10. All the relevant factors – *viz*, the timing and nature of the questioning; the setting of the questioning, within the prison where the torture took place and within earshot and eyeshot of the SDF guards who were committing the torture[3]; the conditions of confinement and deprivation of essentials such as food, water, sleep, and bathroom breaks; the constant physical and psychological mistreatment; the promises and threats made to the defendant that he and his family would be killed if he did not say the "right" things; and the defendant's age, level of education, and intelligence (*Schneckloth*, 412 U.S. at 226; *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *Karake*, 443 F. Supp. 2d at 513) – strongly support suppressing Mr. Sylejmani's statements as involuntary. Under these circumstances, it is of no legal moment whether the FBI interrogators directly abused Mr. Sylejmani or made threats of their own. The relevant inquiry is on Mr. Sylejmani's state of mind, and whether "his will has been overborne and his capacity for self-determination critically impaired." *Culombe*, 367 U.S. at 602. *See also Mohammed*, 704 F. Supp. 2d at 21-22 (Court including, in its analysis of whether Mohammed's

---

[3] The government concedes that "SDF officials were present during some or all of the media interviews with the defendant." Govt. Opp. Br. at 23. Further, while the government pretends "no SDF officials were present while the defendant was being interviewed [by the FBI]" (*id.* at 22), this is simply untrue. The Syrian prison where Mr. Sylejmani was kept was constructed in such a way that SDF guards could see into, and were visible from, the room in which Mr. Sylejmani was interrogated by the FBI.

statements were voluntary or overborne, the torture conducted by Pakistani and Moroccan captors outside the presence of FBI personnel).

It is readily apparent that the unrelenting torture did, in fact, overbear Mr. Sylejmani's will. Each interview – FBI or media – followed a similar general pattern. It was preceded by Mr. Sylejmani being beaten; forced to stand against a wall for hours and not allowed to sit or sleep until the interview took place; and being repeatedly warned that, if he wanted to survive or see his family again, he needed to cooperate. Sylejmani Motion at 2-10. It was followed by a beating by the guards, armed with fists, batons, and wires, which continued until the SDF was convinced that he had "cooperated" with his questioners. *Id.*

The impact of the torture upon Mr. Sylejmani cannot be overstated. For example, years later, Mr. Sylejmani still has vivid, excruciating nightmares about the torture that took place the night following his 3/31/19 FBI interview. As Mr. Sylejmani recounts:

> That night, the guards came and pulled him out of the cell and took him outside the building to learn about what was said at the FBI interview. When his answers did not satisfy them, the guards began to hit him in the back, legs, and stomach. They pulled him from the light into a dark part of the compound and forced him to his knees with his head down. As he knelt there, Mr. Sylejmani could hear them cock their guns. He was certain he was going to be executed without delay, wrapped in a blanket, and buried in an unmarked grave. He would never see his wife and children, and they would never know his fate. … Miraculously, one of the guards, who appeared to be in charge, grabbed Mr. Sylejmani by the back of the neck and listened while Mr. Sylejmani pleaded for his life and swore that he had told the FBI whatever they wanted. Instead of being killed, he was returned to his cell, badly shaken.

Sylejmani Motion at 7. Notably, this is just one episode in a series of similar episodes he endured over the course of many weeks of systematic abuse and torture.

The government contends that this case is no different than *United States v. Elsheikh*, 578 F. Supp. 3d 752 (E.D. Va. 2022), in which the court declined to suppress Elsheikh's statements to the FBI and media. Govt. Opp. Br. at 19-20. The government is wrong. *Elsheikh* is readily

7

distinguished from the instant case for several independent reasons.

First, the *Elsheikh* court held a multi-day evidentiary hearing, including classified testimony in a closed courtroom, before finding that the government had met its burden of proof on the suppression motion. *See Elsheikh*, 578 F. Supp. 3d at 759-770, 774-778. The government's apparent attempt to have that fact-intensive issue decided here on the papers should be rejected.

Second, Elsheikh challenged the FBI interviews on the sole grounds that the DOD and FBI had deliberately worked together to orchestrate a two-step interview process to undermine *Miranda* protections. *Elsheikh*, 578 F. Supp. 3d at 770-774. Here, by contrast, Mr. Sylejmani moves to suppress his FBI and media interviews because those interviews are fatally tainted by torture and therefore involuntary.

Third, Elsheikh did contend that his media statements should be suppressed "because those statements were the involuntary products of alleged torture by SDF personnel." *Elsheikh*, 578 F. Supp. 3d at 770. However, the *Elsheikh* court ultimately admitted the statements at trial because it rejected Elsheikh's torture allegations as "simply not credible," finding that those allegations were "supported by little more than [Elsheikh's] own, uncorroborated words, and is rebutted by a great deal of credible witness testimony and other record evidence." *Id.* at 776. Here, not only has the government failed to produce any witness to rebut Mr. Sylejmani's allegations, but the government has found a corroborating witness. *See* Govt. Opp. Br. at 16.

Fourth, contrary to the government's assertion (Govt. Opp. Br. at 19-20), the *Elsheikh* court did not hold that the SDF was a "private party" whose actions could not violate due process. To begin, the court's statements regarding the uncertainty of state action were *dicta* on its part. Indeed, the court expressly recognized in its *dicta* that "[s]ome court's, including the Fourth Circuit, have suggested that torture by officials of a foreign government might serve as the basis for exclusion

of a confession." *Elsheikh*, 578 F. Supp. 3d at 775 (citing *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008)). Here, it is not yet determined whether the FBI and the SDF were working together as a "joint venture,"[4] with the FBI fully aware and taking advantage of SDF torture to elicit information from Mr. Sylejmani and others, a tactic correctly identified as improper by this Court in *Mohammed*, 704 F. Supp. 2d at 21-22, where the FBI took advantage of Pakistani torture to advance American interrogations.

Further, while, in the absence of a "joint venture," foreign actors such as the SDF may not be required to provide *Miranda* warnings, this does not end the "voluntariness" inquiry or mean that statements obtained by torture may be used at trial. As the Fourth Circuit stated in *Abu Ali*:

> When *Miranda* warnings are unnecessary, as in the case of an interrogation by foreign officials, we assess the voluntariness of a defendant's statements by asking whether the confession is "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). If it is, "it may be used against him." *Id.* at 602. But, if the defendant's "will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id.*; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). The government acknowledges that "[t]he crucial inquiry is whether [Abu Ali's] will has been 'overborne,'" and maintains that it was not; Abu Ali, of course, contends that it was.

528 F.3d at 232. *Accord id.* at 229 n. 5 ("None of our discussion suggests for a moment that courts relax their insistence that confessions must be voluntary and reliable. Regardless of whether there is a joint venture, the voluntariness standard, which serves as the ultimate safeguard against coerced confessions, applies to all interrogations and governs the admissibility of the statements

---

[4] "Under the joint venture doctrine, evidence obtained through activities of foreign officials, in which federal agents substantially participated and which violated the accused's Fifth Amendment or *Miranda r*ights, must be suppressed in a subsequent trial in the United States." *Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980). This too is a fact-intensive inquiry, where "mere presence at an interrogation does not constitute the 'active' or 'substantial' participation necessary for a 'joint venture,' but coordination and direction of an investigation or interrogation does." *United States v. Abu Ali*, 528 F.3d 210, 230 (4th Cir. 2008) (and cases cited).

at issue here."); *United States v. Bary*, 978 F. Supp. 2d 356, 366 (S.D.N.Y. 2013) (affirming that "statements taken by foreign police in the absence of *Miranda* warnings are admissible *if voluntary*") (emphasis added).

Rather than *Elsheikh*, this case is on all fours with *United States v. Karake*, 443 F. Supp. 2d 8, 51 (D.D.C. 2006). *Karake* involved an investigation by Rwandan and American officials into the killing of two American tourists in southwestern Uganda. As here, the horrific abuse experienced by the defendants was conducted entirely by Rwandan officials, not U.S. personnel. Nevertheless, the Court suppressed not just the statements made exclusively to Rwandan investigators, but also the statements made with *Miranda* warnings and waivers to the American investigators. The *Karake* Court found that where, as here, the coercive practices by the Rwandans continued during the time of the American interrogations, those interrogations were fatally tainted by the defendants' understandably fear for their lives, rendering defendants' waiver of *Miranda* rights ineffective and their statements to the Americans involuntary and inadmissible. 443 F. Supp. 2d at 85-86, 94. *See also Mohammed*, 704 F. Supp. 2d at 21-22 (Court including, in its analysis of whether Mohammed's statements were voluntary or overborne, the torture conducted by Pakistani and Moroccan captors outside the presence of FBI personnel).

The *Karake* court held (as did *Abu Ali, supra*) that the relevant test is always "the same test – is it voluntary"? *Karake*, 443 F. Supp. 2d at 86 (quoting *Lyons*, 322 U.S. at 602). In turn, that test is always answered by looking at the defendant's state of mind. "The effect of the earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary." *Id.* at 87 (quoting *Lyons*, 322 U.S. at 603). Here, the government fails to meet its burden of showing that Mr. Sylejmani's statements were voluntary. The continuing torture he suffered during the weeks in which the FBI and media

interviews took place plainly dominated Mr. Sylejmani's mind, rendering his statements involuntary. The government's farfetched contention – that the beatings and mistreatment Mr. Sylejmani experienced both immediately preceding and immediately following each interview somehow dissipated and had no effect during the interview moments themselves – should be rejected by the Court. As in *Karake*, given the weeks of torture he suffered, Mr. Sylejmani was "in no position to refuse to speak with the American investigators, regardless of any arguable comprehension of [his] Fifth Amendment rights." *Id.* at 90.

It is instructive that, while the government seeks to cast doubt on what happened to Mr. Sylejmani by quibbling with certain details or optimistically forecasting what the evidence *might show* at an evidentiary hearing,[5] the government does not specifically deny in its opposition brief that Mr. Sylejmani was subjected to torture. Nor could the government credibly do so. In investigating the matter, the government unearthed the statement of another former SDF detainee, AAM, who corroborates Mr. Sylejmani's account in material detail. It is worth quoting the government's statement regarding AAM in full:

> It should be noted that another former ISIS member identified as AAM was detained at the Dashisha prison in mid-2019 where he met the defendant. According

---

[5] The government unconvincingly asks the Court to give credit now to evidence the government might – or might not – be able to introduce into the record in the future. In this regard, the government states:

> The government *anticipates* that the testimony from one or more FBI personnel who were present during that biometric interview *will indicate* that the agents did not observe any injuries on the defendant, nor did he appear to be moving in a manner that would indicate that he was suffering from injuries one would expect to exist after having been hit with a rubber hose, whipped with electrical wires, or otherwise "so weak" that he appeared unable to walk.

Govt. Opp. Br. at 22 (emphases added); *accord id.* at 19 (claiming *ipse dixit* that unidentified "[t]estimony and evidence at a pre-trial hearing in this case will demonstrate that the statements made by the defendant were voluntary"). Of course, the Court should not credit the possible testimony of unidentified persons in rendering its decision. If the government had such testimony, it had every opportunity to identify the witness and present that evidence in admissible form as part of its opposition papers, but it chose not to do so.

to interviews with the FBI following his return to the United States to face U.S. charges, AAM described the prison conditions as extremely poor and stated that the SDF guards would physically beat and abuse prisoners if they denied being affiliated with ISIS. AAM described one occasion when he, the defendant and another prisoner were locked in an isolation room with freezing temperatures. In all AAM's conversations with Sylejmani, the defendant never made any claims of being abused or coerced to make statements to the media or law enforcement. AAM personally reported that he was beaten before an FBI interview by the SDF, and that after the interview he was beaten and placed in isolation. He also reported that the FBI told him during one interview that he would be permitted to make a phone call to his family, but when he later asked SDF for permission to make the call, he was beaten and placed in isolation. AAM admittedly lied to the FBI during two interviews, following beatings by SDF before and after the second interview. AAM never underwent mistreatment at the hands of the FBI.

*See* Govt. Opp. Br. at 16.

Like Mr. Sylejmani, AAM was (i) placed in unbearable, life-threatening conditions; (ii) beaten and threatened if he said the wrong thing; (iii) beaten before and after his FBI interviews; and (iv) lied to the FBI in consequence of the SDF beatings and threats he received. AAM's experiences mirror and fully accord with Mr. Sylejmani's experiences and show why Mr. Sylejmani desperately decided that he had no choice but to say or agree to anything that might help him survive the SDF prison and get himself and his family returned to America.

For all these reasons, and those set forth in his moving papers, the Court should suppress Mr. Sylejmani's statements. At the least, the Court should hold an evidentiary hearing to make its own determination about the "totality of the circumstances" and whether that totality meant that Mr. Sylejmani's "will had been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225-226. In this regard, it is instructive that in other cases involving alleged torture and its impact on the voluntariness of statements by the defendant, the trial court conducted lengthy and exhaustive evidentiary hearings and briefings before rendering its decision on the matter. *See*, *e.g.*, *Karake*, 443 F. Supp. 2d at 83-86 (concluding after exhaustive review that statements were involuntary and would be suppressed); *United States v. Abu Ali*, 395

12

F. Supp. 2d 338, 361-379 (E.D. Va. 2005) (concluding after exhaustive review that statements were voluntary and admissible); *Elsheikh*, 578 F. Supp. 3d at 759-770, 774-778 (holding multi-day evidentiary hearing, including classified testimony in a closed courtroom, before ruling on defendant's motion to suppress).

### III.    THE LAST INTERVIEW, WHICH TOOK PLACE ON THE FBI TRANSPORT, ALSO REMAINS INADMISSIBLE

While Mr. Sylejmani's FBI transport interview did not take place in an SDF prison surrounded by his SDF torturers, it is still involuntary. Specifically, the "break in the stream of events" was not "sufficient to insulate the statement from the effect of all that went before." *Clewis v. State of Texas*, 386 U.S. 707, 710 (1967); *Al Rabiah v. United States*, 658 F. Supp. 2d 11, 36 – 37 (D.D.C. 2009) (finding, in the context of a Guantanamo Bay case, that the government did not meet burden of showing dissipation of coercion). A few days and a shift in custody could not possibly dissipate the many months of torture, deprivation, and intense psychological conditioning to which Mr. Sylejmani was subjected, making his statements on the plane as involuntary as the others. *See, e.g., Schneckloth*, 412 U.S. at 226 (assessing "the psychological impact on the accused" in determining whether prior coercion has sufficiently dissipated to render a defendant's statements voluntary). At the least, an evidentiary hearing is required before the government can meet its burden of proving that there had been sufficient dissipation for the last interview to be considered voluntary. This is because determining whether the effects of the earlier coercion have dissipated – that is, to determine the voluntariness of the subsequent confession – this Court must apply a fact-intensive "totality of the circumstances" test. *Id.*; *Karake*, 443 F. Supp. 2d at 87; *Oregon v. Elstad,* 470 U.S. 298, 310 (1985). These circumstances, and their continuing effect on Mr. Sylejmani's state of mind, are best determined through an evidentiary hearing.

In addition to its involuntary nature, the FBI transport interview should be suppressed as

"fruit of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471 (1963), and its progeny. *See, e.g., United States v. Jones*, 374 F. Supp. 2d 143, 153 (D.D.C. 2005) (emphasizing that "the policies underlying the exclusionary rule" do not "invite any logical distinction between physical and verbal evidence" (quoting *Wong Sun* at 485-86)). On the transport, no new ground was covered. Instead, the FBI asked Mr. Sylejmani to confirm the contents of his prior interviews with ABC, CBS, the Defense Post, and NPR. Accordingly, the FBI transport interview should be suppressed as fruit of the prior improper interviews.

## CONCLUSION

For each of the reasons discussed above and in his moving papers, the Court should (i) grant Mr. Lirim Sylejmani's motion to suppress statements; (ii) suppress all his statements in their entirety; and (iii) grant him such other and further relief as the Court deems just and proper. At the least, the Court should hold an evidentiary hearing before issuing its decision on the motion to suppress.

Dated: July 30, 2024

    /s/
Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, New York 10004

and

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

    /s/
Ubong E. Akpan
Assistant Federal Public Defender
Federal Public Defender's Office
625 Indiana Ave, NW, Suite 550
Washington, D.C. 20004

*Attorneys for Mr. Lirim Sylejmani*